UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 OCT 20  A 8: 55

| | |
|---|---|
| OLD REPUBLIC NATIONAL TITLE INSURANCE CO., and OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, as Subrogee of EASTERN SAVINGS BANK, Plaintiffs,<br><br>v.<br><br>BANK OF EAST ASIA LIMITED, et al., Defendants. | CIVIL ACTION NO.<br>3:01CV1772 (SRU) |

## RULING ON DEFENDANT BANK OF EAST ASIA LIMITED'S MOTION TO DISMISS

This action arises out of a fraudulent mortgage loan scheme allegedly perpetrated by Margaret Lee upon Eastern Savings Bank ("ESB"). Plaintiff, Old Republic National Title Insurance Company ("Old Republic"), brings this action as a subrogee to ESB's rights to the mortgage loan proceeds. Old Republic alleges that the Bank of East Asia Limited (the "Bank of East Asia"), the depository bank of the mortgage loan proceeds, negligently negotiated and wrongfully converted the loan proceeds. The Bank of East Asia moves for dismissal, arguing that Old Republic lacks standing and cannot maintain either cause of action against a depository bank. For the reasons that follow, the Bank of East Asia's motion to dismiss is denied.

I.  **Facts**

For purposes of this motion, the factual allegations made in the Amended Complaint are assumed to be true and all inferences are drawn in the light most favorable to Old Republic.

Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).[1]

In the summer of 1998, Lee submitted to ESB a fraudulent mortgage loan application in order to obtain a mortgage on her sister Nancy Chang's property located at 36 Upland Drive, Greenwich, Connecticut (the "Chang Property"). In furtherance of the application, Lee fraudulently prepared two powers of attorney bearing the forged signatures "Nancy Chang." The two powers of attorney purportedly authorized Lee to mortgage or sell the Chang Property. In October 1998, ESB issued to Lee an approximately one-million-dollar mortgage loan (the "Chang Loan"). M. Dean Montgomery ("Montgomery") represented ESB and Old Republic at the closing of the loan. As part of the Chang Loan transaction, Montgomery, acting on behalf of Old Republic, issued a title insurance policy to ESB, insuring ESB with respect to the Chang Loan. ESB then wire transferred the net proceeds of the Chang Loan to Montgomery's escrow account at People's Bank in Connecticut ("People's Bank").

With a portion of the net loan proceeds, Montgomery, acting on behalf of ESB, purchased ten cashier's checks[2] from People's Bank.[3] Each check identified "Nancy Chang" as

---

[1] Old Republic has named numerous defendants in the Amended Complaint. The motion presently before the court, however, pertains solely to the Bank of East Asia. Accordingly, this section is limited to only those facts relevant to the present motion involving Old Republic's claim against the Bank of East Asia.

[2] A cashier's check is an instrument drawn by a commercial bank on itself, representing an unconditional promise to pay the face value to the payee named thereon. Moon Over the Mountain, Ltd. v. Marine Midland Bank, 87 Misc. 2d 918, 920 (N.Y.C. Civ. Ct. 1976).

[3] For purposes of the present motion, People's Bank is also referred to as an "issuing bank" because it issued the cashier's check and Montgomery is also referred to as a "remitter." See New York Uniform Commercial Code§ 4-104 (k) ("Remitter means the buyer from the obligated bank of a cashier's check or a teller's check, and the drawer of a certified check.").

the sole payee[4] and was made payable in the amount of $78,029.08. Montgomery then gave the ten cashier's checks to Lee, apparently with the understanding that Lee would deliver the checks to her sister.

Thereafter, Lee opened three accounts at the Bank of East Asia; two of the accounts purported to be joint accounts with Chang. The accounts were opened without Chang's knowledge or authority. Lee then forged her sister's signature on each of the ten cashier's checks and deposited the checks at the Bank of East Asia.[5] Throughout the course of October 1998, People's Bank paid out on the ten cashier's checks and, ultimately the Bank of East Asia credited that money to the Lee-Chang joint accounts. Thereafter, ESB received two monthly mortgage loan payments through automatic withdrawals from the joint accounts at the Bank of East Asia. Lee then withdrew and disbursed all remaining funds from the joint accounts without Chang's knowledge or authority.

In January 1999, Chang informed Montgomery that she had not executed a power of attorney in favor of Lee, had not authorized the mortgage to be placed on her property, and had not received any of the proceeds of the mortgage. Two weeks later, Montgomery informed People's Bank that the ten cashier's checks were fraudulently endorsed.

In September 1999, Old Republic paid ESB approximately one-million dollars in settlement of ESB's claims under the title insurance policy issued by Old Republic National Title Insurance Company, and became subrogated to ESB's claims. In the present action, Old Republic

---

[4] A payee is the person to whose order the check is written. See generally White & Summer, Uniform Commercial Code § 16-1.

[5] A bank that accepts, for deposit, commercial, teller, or cashier's checks, is known as a depository bank.

3

seeks to recover the $780,291 paid out over the ten fraudulently endorsed checks.

## II.     Allegations and Defenses

Old Republic claims that, pursuant to New York statutory and common law,[6] it is entitled to recoup the $780,291 because the Bank of East Asia wrongfully negotiated and converted the ten cashier's checks. More specifically, Old Republic claims that the Bank of East Asia, the depository bank, negligently negotiated the cashier's checks by failing to exercise ordinary care in processing the cashier's checks in which ESB had a legal interest when it allowed Lee to open joint accounts without her sister's approval, accepted the ten fraudulently endorsed cashier's checks, presented the checks to People's Bank and then paid out on the ten forged cashier's checks. See New York Uniform Commercial Code ("NY UCC or the "Code") § 4-401; Broadway Nat. Bank v. Barton-Russell Corp., 585 N.Y.S.2d 933, 944 (N.Y. Sup. 1992).

In addition, Old Republic argues that the Bank of East Asia converted funds of ESB by making or obtaining payment on the ten cashier's checks for a person other than the named payee (Nancy Chang), that is, for a person not entitled to enforce the instrument or to receive payment. NY UCC § 3-419(1)(c) (an instrument is converted when it is paid on a forged indorsement); see also Vigilant Ins. Co. of America v. Housing Authority of the City of El Paso, Texas, 87 N.Y.2d 36 (1995) ("Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.").

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Bank of East Asia moves to dismiss, arguing that the Amended Complaint fails to state a claim against the Bank of

---

[6] The parties stipulate that all claims asserted by Old Republic against the Bank of East Asia are governed by New York law.

4

East Asia for which relief can be granted. The Bank of East Asia makes three principal arguments in support of its claim. The defendant first argues that Old Republic does not have standing to enforce a negotiable instrument on behalf of Montgomery. Second the Bank of East Asia argues that, even if Old Republic has standing to assert claims on behalf of Montgomery, a remitter does not have legally enforceable rights in a cashier's check. Third, the defendant argues that, if a remitter can enforce a cashier's check, the remitter can only enforce it against People's Bank, the issuing bank, not the Bank of East Asia, the depository bank.

### III.     Standard of Review for a Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim, the court "must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). It is only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief" that it is appropriate to grant a motion to dismiss for failure to state a claim. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).

### IV.     Discussion

#### A.     Standing

The Bank of East Asia first argues that Old Republic, standing in the shoes of ESB, lacks standing to assert claims on behalf of Montgomery, ESB's agent. In this case, Montgomery

5

was acting as ESB's agent. ESB wired in excess of $ 940,000 to Montgomery's account at People's Bank. With a portion of the loan proceeds, Montgomery purchased from People's Bank ten cashier's checks made payable to "Nancy Chang" and delivered the checks to Lee. Moreover, the funds, which ESB wired to Montgomery to purchase the cashier's checks, at all times belonged to ESB. Although Montgomery purchased the checks, he did so on behalf of ESB, and the funds used to purchase the checks, therefore, belonged to ESB. Accordingly, ESB had a direct and legal interest in the funds, purchased by its agent, and deposited at the Bank of East Asia. Thus, ESB has standing to assert any claims available to Montgomery with respect to the cashier's checks.

Montgomery is proceeding upon his rights in a separate state court action he commenced against People's Bank to recover, in part, on the proceeds of the cashier's checks. The Bank of East Asia argues that permitting Old Republic to maintain the present action could lead to double recovery and inconsistent rulings. Double recovery and inconsistent rulings will not result, however, because whichever action (the Montgomery-People's Bank action or the current action) proceeds to judgment first, that action will provide a claim preclusion bar in the subsequent action. Moreover, if the Bank of East Asia is found liable either in the current lawsuit or in a subsequent lawsuit commenced by People's Bank,[7] payment on either judgment would bar collection of the other. Obviously, the defendant is potentially liable to either the agent or the principal, but not both on the same claim. See Prevor-Mayorsohn Caribbean, Inc. v. Puerto Rico

---

[7] People's Bank could arguably implead the Bank of East Asia in its suit against Montgomery.

Marine Management, Inc., 620 F.2d 1, 4 (noting that Federal Rule of Civil Procedure 17(a)[8] and "res judicata principles protect against the possibility of double recovery .... such that principals are bound by judgments entered in actions properly litigated by their agents on their behalf.").

### B. Statutory Claims

The New York courts have not addressed the specific question of whether, pursuant to either the Code or common law, a remitter may proceed directly against a depository bank that allegedly converted or negligently negotiated fraudulently endorsed cashier's checks. The Bank of East Asia argues first that a remitter cannot enforce a negotiable instrument because only a "holder"[9] of a negotiable instrument"[10] can enforce such an instrument, and a remitter cannot qualify as a holder. Second, the Bank argues that if a remitter can enforce a negotiable instrument, the remitter can enforce it only against People's Bank, the issuing bank, not against the Bank of East Asia, the depository bank.

#### 1. Enforcement of a negotiable instrument by a remitter

The Bank of East Asia first asserts that only a holder of a cashier's check can enforce such a check. In support of this argument, the Bank of East Asia relies primarily on the language

---

[8] "The basic purpose of Rule 17(a)'s insistence that every action be prosecuted in the name of the real party in interest is to protect a defendant from facing a subsequent similar action brought by one not a party to the present proceeding and to ensure that any action taken to judgment will have its proper effect as res judicata." Prevor-Mayorsohn Caribbean, Inc., 620 F.2d at 4.

[9] A "holder" is defined as a "person who is in possession of a document of title or an instrument or an investment certificated security drawn, issued or indorsed to him or to his order or to bearer or in blank." NY UCC § 1-201 (20).

[10] The parties do not dispute that a cashier's check is a negotiable instrument. See Bobrick v. Second Nat'l Bank of Hoboken, 175 A.D. 550, 552 (1st Dep't 1916).

7

in NY UCC § 3-419(1)(c), Official Comment 2 ("[a] negotiable instrument is the property of the holder"), and the decision in <u>Underpinning & Foundation Constructors, Inc. v. Chase Manhattan Bank, N.A.</u>, 46 N.Y.2d 459, 465 (1979) ("With respect to the possibility of conversion of the check itself, since the drawer [the person on whose account a check is drawn] is not a holder, and could not present the check for payment, the drawer is normally considered as having no interest in the check.") (brackets added).

Read either in isolation or in combination, the Official Commentary and <u>Underpinning</u> do not make indisputably clear -- as would be required to grant the motion to dismiss -- that only a holder can enforce a negotiable instrument. First, the comment that "a negotiable instrument is the property of the holder" does not specifically preclude remitters from enforcing a negotiable instrument. <u>See</u> White & Summer, Uniform Commercial Code § 15-4 (Section 3-419 "does not identify the proper plaintiffs nor, except by indirection, the proper defendants."). In fact, the New York courts have indicated that remitters can also have an interest in a negotiable instrument. For example, in <u>Kerr Steamship Co. v. Chartered Bank of India, Australia and China</u>, 292 N.Y. 253 (1944), New York's highest court, after determining that the bank drafts at issue in that case were "in all material respects" analogous to cashier's checks, held that "[u]ntil title to the instrument is transferred to the payee the 'remitter' or 'purchaser' remains its owner and in some circumstances may sue upon the instrument as if named as payee." <u>Id.</u> at 262; <u>see also</u> <u>Bunge v. Manufacturer's Hanover Trust Co.</u>, 37 A.D. 2d 409, 415 (1st Dept. 1971) (recognizing that the payee of cashier's checks, "as owner of the checks, had the absolute right of disposing of them as it saw fit, including the right to return them" to the bank.); <u>Menthor, S.A. v. Swiss Bank Corp., et al.</u>, 549 F. Supp. 1125, 1129 (S.D.N.Y. 1982) ("Menthor, as owner of the checks, has standing to sue

8

MHT for conversion under U.C.C. § 3-419"); Gallery Garage Management Corp. v. Chemical Bank, 642 N.Y.S.2d 217, 218 (N.Y. Sup. Ct. 1996) (in holding that a payee of an undelivered check does not have standing to sue, the court stated that the "situs of the funds plays no role in the Court's analysis of who is a true owner or holder with standing to sue."). Although these cases do not clearly delineate under what circumstances a remitter may be able to enforce a negotiable instrument, they do indicate that a remitter may, in some circumstances, be able to enforce the instrument because the remitter has a property interest in the negotiable instrument.

The Bank of East Asia also claims that Underpinning precludes any party but a holder from enforcing rights in a negotiable instrument. See Underpinning, 46 N.Y.2d at 465 ("[w]ith respect to the possibility of conversion of the check itself, since the drawer is not a holder, and could not present the check for payment, the drawer is normally considered as having no interest in the check). New York courts, however, could reasonably interpret Underpinning only as precluding enforcement by a party with no interest in a negotiable instrument. It is not disputed that a remitter, as an owner of a cashier's check, has an interest in the check. Moreover, a remitter retains an ownership interest in a cashier's check until the check is delivered to the payee named on the check. Kerr v. Chartered Bank of India, 292 N.Y. 253, 262 (1944) ("Until title to the instrument is transferred to the payee the 'remitter' or 'purchaser' remains its owner and in some circumstances may sue upon the instrument as if named as payee."). In this case, Old Republic retains its ownership interest in the cashier's checks because the checks were never transferred to Chang, the payee. The negotiation of the checks to Lee has no effect on ESB's ownership interest. Accordingly, Old Republic's ownership interest in the cashier's checks still existed at the time of the Bank of East Asia's alleged negligence and conversion.

9

2. <u>Enforcement against a depository bank</u>

The Bank of East Asia next argues that if a remitter can sue upon a negotiable instrument, it cannot enforce such an instrument against a depository bank for having negligently negotiated or wrongfully converted fraudulently endorsed cashier's checks. Rather, the Bank of East Asia argues that the remitter must proceed against the issuing bank and, if the issuing bank believes the depository bank is liable for the negotiation or conversion of the remitter's funds, then the issuing bank can sue the depository bank. The Bank of East Asia makes several arguments in support of this assertion.

The Bank of East Asia first asserts that, because a drawer is unable to proceed directly against a depository bank, a remitter should not possess rights that a drawer does not have. In the typical checking scheme there are four parties: the drawer -- the person on whose account the check is drawn; the drawee -- the bank upon which the check is drawn; the payee -- the person to whose order the check is written; and the depository bank -- the bank were the check is presented for deposit or payment. See generally White & Summer, Uniform Commercial Code § 16-1. In the normal course of business, the drawer delivers a check to the payee. The payee then presents the check to the depository bank for payment and/or deposit into the payee's account. The check is then routed from the depository bank to the drawee bank, which in turn, transfers the appropriate funds to the depository bank. If the depository bank negligently negotiates the check or converts the funds of the drawer, it is the general rule in New York that, except in rare circumstances,[11] a drawer cannot maintain a direct cause of action under the Code against a

---

[11] The New York Court of Appeals in <u>Underpinning</u> recognized an exception to the general rule that a drawer does not have a cause of action against a depository bank that wrongfully paid over a forged endorsement. The Court held that "it is only in those

10

depository bank for conversion or negligence. See Horowitz v. Roadworks of Great Neck, Inc., 76 N.Y.2d 975 (1990); Underpinning, 46 N.Y.2d 457 (1979).

> In the typical forged indorsement case, the indorsement will be ineffective, and thus the check will not authorize the drawee bank to pay it from the drawer's account. Absent such authority, the drawee may not charge the drawer's account--and any payment made on the check is deemed to have been made solely from the property of the drawee, not the drawer... Since the money received by the depository bank from the drawee is the property not of the drawer, but rather of the drawee alone, nothing the depository bank does with those funds can be considered a conversion of the drawer's property....

Id. at 465-67.

Thus, because the drawer has no interest in the check, the drawer has not been injured by the depository bank's alleged negligence or conversion. In the absence of injury, the drawer has neither the incentive nor the right to sue the depository bank.

The rationale for denying a drawer a cause of action against a depository bank is not necessarily applicable, however, to the situation of a remitter. In the case of a cashier's check, the drawee bank is also the issuing bank and the drawer of the cashier's checks. Moon Over the Mountain, Ltd., 87 Misc. 2d at 920. Although the issuing bank is referred to as the drawer on the cashier's checks, for practical purposes, the issuing bank is using the remitter's funds in paying the payee. Accordingly, the remitter retains an interest in the cashier's checks. In addition, whereas a drawer's account is not debited in the case of a forged indorsement, a remitter has already paid

---

comparatively rare instances in which the depository bank has acted wrongfully and yet the drawee has acted properly that the drawer will be able to proceed directly against the depository bank." Underpinning, 46 N.Y.2d at 466. The Underpinning exception is not applicable to the present case because: (1) this is a case of a remitter, not a drawer, proceeding against a depository bank; and (2) Old Republic has not alleged that drawee has acted properly; rather Old Republic alleges that both the drawer and drawee have acted improperly.

11

for the cashier's checks when a depository bank negotiates or converts the cashier's checks. See Lawrence v. Central Plaza Bank and Trust Co., 469 So. 2d 201, 204 (Fla. App. 2d Dist. 1985) (holding that a remitter has an ownership interest in cashier's check until the checks are delivered to the payee because a remitter -- as opposed to a drawer who has lost nothing of value until his account is debited -- has had his account debited by the time the depository bank honors the cashier's checks). Thus, in the case of a remitter, the depository bank is technically dealing with the funds of the issuing bank, yet it is the remitter that has the direct interest in the funds. Therefore, if the depository bank acts wrongfully with a cashier's check, the remitter will be injured and will have an incentive to sue the depository bank. See 6 Hawkland UCC Series Revised § 3-420:4 (noting that a remitter "should be found to have an action for conversion on a bank check"); see also Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions*, 36 B.C.L. Rev. 619 (1995); but see 11 Am. Jur. 2d Bills & Notes § 308 (1997) (remitter not entitled to enforce cashier's check); Timothy R. Zinnecker, *A Literalist Proposes Four Modest Revisions to U.C.C. Article 3*, 32 U. Rich. L. Rev. 63, 101 (1998) (purchaser of cashier's check, which was not payable to purchaser, not entitled to enforce instrument).

In addition, the New York courts could reasonably conclude that permitting a remitter to sue a depository bank is consistent with "principles of equity and sound public policy." Underpinning, 46 N.Y.2d at 468. In Underpinning, the Court held: "[I]t is basic to the law of commercial paper that as between innocent parties any loss should ultimately be placed on the party which could most easily have prevented that loss. Hence, in most forged indorsement cases, the party who first took the check from the forger will ultimately be liable, assuming of course

that there is no solvent forger available. This is so because it is the party who takes from the forger who is in the best position to verify the indorsement." Id. In this case, Old Republic alleges that the Bank of East Asia was in the best position to prevent the fraud because it was the Bank of East Asia that: (a) allowed Lee to open joint accounts in the name of Nancy Chang, without Chang's knowledge or consent; and (b) accepted and paid out on the ten cashier's checks bearing the forged indorsement of Chang. Accordingly, the New York courts might well conclude that the Bank of East Asia should be held responsible for paying on the cashier's checks over the forged indorsements because the Bank of East Asia was in the best position to prevent the fraud.

Third, the Bank of East Asia argues that, because the Code provides a depository bank with statutory defenses that it can raise against an issuing bank seeking to enforce a negotiable instrument, the Code implicitly provides that only an issuing bank can enforce a negotiable instrument against a depository bank. See, e.g., NY UCC § 4-207(4) (issuing bank failed to commence action for paying on an allegedly forged indorsement within a reasonable time); NY UCC § 3-406 (issuing bank's negligence caused the forgery); NY UCC § 4-406 (issuing bank neglected to report the forgery); or NY UCC § 4-406(5) (the issuing bank waived or failed to assert a valid defense against the drawer); see also Stone and Webster Engineering Corp. v. First National Bank and Trust Co., 345 Mass. 1 (1962); Dioguardi v. Metropolitan Sav. & Loan Assoc. of Eastern Penna., 9 Phila. Co. Rptr. 582 (Ct. of Com. Pl. of PA, Phil. Co. 1983). The presence of a loss-allocation scheme between an issuing bank and a depository bank relates, however, only to those two parties. The fact that a depository bank has a defense to a cause of action asserted by an issuing bank does not necessarily mean that only the issuing bank can assert

13

a cause of action against the depository bank. Rather, the New York courts could conclude that, if the Code drafters intended only issuing banks to sue depository banks, they should have explicitly said so in the Code.

In sum, at the motion to dismiss stage, the burden is on the Bank of East Asia to demonstrate that it "appears beyond doubt" that Old Republic "can prove no set of facts in support of the claim which would entitle it to relief." Conley, 355 U.S. at 45-46. The Bank of East Asia has not met that burden. Case law indicates that, in certain circumstances, remitters may have enforceable rights in a negotiable instrument. New York law may ultimately limit those rights to enforcement against an issuing bank. For purposes of the pending motion to dismiss, however, the issue is whether the Code or case law presently precludes a remitter from enforcing a negotiable instrument against a depository bank. The court concludes that neither the Code nor case law indisputably precludes a remitter from enforcing a cashier's check directly against a depository bank. Accordingly, the Bank of East Asia's motion to dismiss Old Republic's statutory claims is denied.

### C. Common Law Claims

Old Republic also alleges that the Bank of East Asia wrongfully converted and negotiated Old Republic's funds in violation of New York common law. The Code provides that principles of law and equity shall supplement its provisions unless there is a particular provision of the Code that displaces the common law. NY UCC § 1-103. The court has discovered no particular provision of the Code that would displace a remitter's common-law claim of conversion or negligence against a depository bank. See Section 3-420 ("An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or

14

indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee."). The Code excludes drawers and persons who never received delivery from the class of possible plaintiffs claiming conversion, but does not specifically exclude remitters. In describing negligence causes of action, the Code states that "[u]nder this Article banks come under the general obligations of the use of good faith and the exercise of ordinary care.... No attempt is made in the Article to define *in toto* what constitutes ordinary care or lack of it." NY UCC 4-103, Official Comment 4. See also Castello, 288 F.3d 339 (holding that a remitter can bring a common law negligence claim because the court found no specific UCC provision to preclude a common law negligence claim); cf. Prudential, 73 N.Y. 2d 263 (noting that whether a plaintiff can proceed on a common law cause of action for "commercial bad faith" is not dependent on the merits of either the statutory or common law conversion claim); Moore, 466 N.Y.S.2d at 133 (denying common law conversion claim when plaintiff submitted that defendant bank acted in good faith in negotiating the plaintiff's check). Accordingly, Old Republic can maintain its common law causes of action.

## V. Conclusion

For all the reasons stated above, the Bank of East Asia's motion to dismiss [doc. # 31] is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 17th day of October 2003.

_____
Stefan R. Underhill
United States District Judge

15