EXHIBIT G

116

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

2005 MAY -6  A 11: 47

---------------------------------------------------------

| | |
|---|---|
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY and OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY as Subrogee of Eastern Savings Bank, | : CIVIL ACTION CASE NO. : 3:01-CV-1772(SRU) |
| Plaintiffs, | : |
| v. | : |
| BANK OF EAST ASIA LIMITED, M. DEAN MONTGOMERY, ESQ., BENTLEY, MOSHER, BABSON & LAMBERT, P.C., MARGARET L. LEE, JOHN CHENG, SINOWEST FINANCIAL SERVICES, TCRM ADVISORS, INC. and TCRM COMMERCIAL CORP., | : : : : : : |
| Defendants. | : MAY 5, 2005 |

---------------------------------------------------------

## PLAINTIFFS' MOTION TO DEFAULT DEFENDANT JOHN CHENG FOR FAILURE TO APPEAR

Plaintiffs Old Republic National Title Insurance Company ("Old Republic") and Old Republic, as Subrogee of Eastern Savings Bank (collectively referred to hereinafter as "Plaintiffs") hereby move pursuant to Rule 55 (a) of the Federal Rules of Civil Procedure that a default enter against defendant John Cheng ("Cheng") for failure to appear in this action and further represents as follows:

1.     As shown by the return of service attached on file in this action and attached as Exhibit 1, Cheng was duly served with the summons and complaint on September 20, 2001, but no appearance has been entered on his behalf.

2.     To the best of Plaintiff's knowledge and belief, as set forth in the attached Declaration of John T. Carroll (Exhibit 2), Cheng is not a member of the United States military.

PLAINTIFFS
OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY

By: _Frank Silvestri_

Frank J. Silvestri, Jr., Esq.
Federal Bar No: ct05367
Madeleine F. Grossman, Esq.
Federal Bar No.: ct05987
LEVETT ROCKWOOD P.C.
33 Riverside Avenue
P.O. Box 5116
Westport, CT 06881
Telephone: (203) 222-0885
Facsimile: (203) 226-8025

## CERTIFICATION

This is to certify that a true and correct copy of the foregoing was mailed, First Class Mail, postage pre-paid, on this the 5th day of May, 2005, to the following counsel of record:

William Champlin, III, Esq.
Tyler, Cooper & Alcorn
CityPlace – 35th Floor
185 Asylum Street
Hartford, CT  06103-3488

Francis M. Donnarumma, Esq.
100 Grand Street, Suite 2F
Waterbury, CT  06702

Scott S. McKessy, Esq.
Reed Smith LLP
599 Lexington Avenue, 29th Floor
New York, NY  10022

Kenneth Sussmane, Esq.
Sussmane & Zapfel
1065 Avenue of the Americas, 11th Floor
New York, NY  10018

Christopher L. Brigham, Esq.
Updike, Kelly & Spellacy, P.C.
One Century Tower
265 Church Street
New Haven, CT  06510

John Cheng
c/o Sinowest Financial Services
40 Elizabeth Street
New York, New York  10013

Frank J. Silvestri

94747

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------

| | |
|---|---|
| OLD REPUBLIC NATIONAL TITLE : <br> INSURANCE COMPANY and OLD REPUBLIC : <br> NATIONAL TITLE INSURANCE COMPANY AS: <br> Subrogee of Eastern Savings Bank, <br> : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> BANK OF EAST ASIA LIMITED, M. DEAN : <br> MONTGOMERY, ESQ., BENTLEY, MOSHER, : <br> BABSON & LAMBERT, P.C., MARGARET L. : <br> LEE, JOHN CHENG, SINOWEST FINANCIAL : <br> SERVICES, TCRM ADVISORS, INC. and TCRM : <br> COMMERCIAL CORP., : <br> : <br> Defendants. : | CIVIL ACTION <br> CASE NO. <br> 3:01-CV-1772(SRU) <br><br><br><br><br><br><br><br><br><br><br><br> MAY 4, 2005 |

----------------------------------------------------------

## DECLARATION OF JOHN T. CARROLL

1.    I am over eighteen years of age and I understand the obligations of an oath. I am an attorney admitted to practice in Massachusetts, and am Claims Counsel to Old Republic National Title Insurance Company ("Old Republic"), the plaintiff in this action. I have been personally involved in the dispute underlying this matter on Old Republic's behalf since approximately January 1999, when Eastern Savings Bank first gave notice of a claim under its title policy issued by Old Republic through its title agent, defendant M. Dean Montgomery. Prior to the commencement of litigation, I participated in the investigation of the claimed loss. I met with representatives of the office of the United States Attorney for the District of Maryland and the Federal Bureau of Investigation and attended the plea and sentencing hearings of defendant Margaret Lee in

a criminal prosecution brought against her in the United States District Court for the District of Maryland, which was based on her actions relating to the transaction involved in this case. Once litigation was commenced I served as liaison with outside counsel and monitored the litigation for Old Republic.

2.     I am submitting this Declaration in support of Old Republic's motion for a default against defendant John Cheng, who has not appeared in this action. To the best of my knowledge, information and belief, defendant Cheng is not and has not been a member of the United States Military at any time relevant to this litigation. I base this on the following:

(a)     As part of Old Republic's investigation, we obtained a copy of a summary of a proffer session with Margaret Lee conducted by representatives of the United States Attorney's Office in Maryland and representatives of the FBI. Ms. Lee's lawyer was also present. A copy of the report of this interview, as set forth on FBI Form 302, is attached as Exhibit A hereto. That interview establishes that John Cheng was associated with a company called Sinowest Financial Services in New York (p. 1), that Cheng maintained an office at Sinowest's place of business (p. 2), and that he was directly and repeatedly engaged in this transaction starting in late 1997 and continuing all the way through the misappropriation of the proceeds of the October 1998 mortgage loan closing (pp. 1 – 8). He attended several meetings in New York with Margaret Lee, he telephoned her "repeatedly" (p. 3), he arranged for the paperwork for the forged power of attorney (pp. 4 - 5), he set up the contact between Lee and the mortgage broker who obtained the loan from Eastern (p. 7), he attended the closing (p. 7), he helped Lee open the accounts at Bank of East Asia into which the loan proceeds were deposited (p. 8), he attended the

mortgage loan closing (p. 8), and he went with Lee to pick up the checks from Montgomery after the rescission period was over, (p. 8), he held the key to the safe deposit box where Lee placed some of the checks, and he (and/or his girlfriend) accompanied Lee for all deposits and withdrawals at the Bank of East Asia (p. 8). The Form 302 Report identifies defendants Cheng as a member of a family who "control the west side of Chinatown in New York" (p. 10) "as in organized crime" (p. 2).

(b) At pages 77-78 of his deposition on July 31, 2003 (attached as Exhibit B), defendant Montgomery confirmed that defendant Cheng was present at the closing. Montgomery identified Exhibit 25 (attached as Exhibit C) as a copy the jacket for his file for the October 1998 closing; Cheng's business card from Sinowest Financial Services was stapled to the folder.

3.    Based on this record of John Cheng's extensive and continuing personal involvement in the transaction at issue over a period of nearly a year, his maintenance of an office at Sinowest Financial Services in New York on an ongoing basis, his holding himself out through a business card as being associated with Sinowest at an office in New York, the illegal activities ascribed to him in the Form 302 Report, and his reputed affiliation with a family involved in organized crime in Chinatown, I believe that Cheng has not been a member of the United States Military on active duty at any time relevant to this litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2005.

John T. Carroll
John T. Carroll

EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 JUN -9 P 12: 23

-------------------------------------------------

OLD REPUBLIC NATIONAL TITLE        :    CIVIL ACTION CASE NO.
INSURANCE COMPANY and OLD REPUBLIC :    3:01-CV-1772(SRU)
NATIONAL TITLE INSURANCE COMPANY as :
Subrogee of Eastern Savings Bank,   :

          Plaintiffs,               :

v.                                  :

BANK OF EAST ASIA LIMITED, M. DEAN  :
MONTGOMERY, ESQ., BENTLEY, MOSHER,  :
BABSON & LAMBERT, P.C., MARGARET L. :
LEE, JOHN CHENG, SINOWEST FINANCIAL :
SERVICES, TCRM ADVISORS, INC. and TCRM :
COMMERCIAL CORP.,                   :

          Defendants.               :        JUNE 8, 2005

-------------------------------------------------

### PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS JOHN CHENG AND SINOWEST FINANCIAL SERVICES

Plaintiffs Old Republic National Title Insurance Company ("Old Republic") and Old

Republic, as Subrogee of Eastern Savings Bank (collectively referred to hereinafter as

"Plaintiffs") hereby move, pursuant to Rule 55 (b) of the Federal Rules of Civil Procedure and

upon the Declaration of John T. Carroll attached as Exhibit A, that a default judgment enter

against the defendants John Cheng ("Cheng") and Sinowest Financial Services ("Sinowest")

(collectively referred to hereinafter as "Defendants"). In support of this motion, Plaintiffs

represent as follows:

      1.     A default entered against Defendants in this action by orders dated May 12, 2005.

Copies of the orders are attached as Exhibit B.

2.    The claim against Defendants for fraudulent and negligent misrepresentation and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at §§ 42-110a et seq. of the Connecticut General Statutes, is in the amount of $1,284,390.00, which is calculated as follows:

a.    <u>Actual Damages</u>- As set forth in the Carroll Declaration, on September 7, 1999, Old Republic Title Insurance Company paid Eastern Savings Bank $975,000 in settlement of the claim made by Eastern Savings Bank on the title insurance policy. In December 2004, Plaintiffs entered into a settlement agreement with Defendants Bank of East Asia Limited, M. Dean Montgomery, Esq., Bentley, Mosher, Babson & Lambert, P.C., People's Bank and TCRM Advisors, Inc., whereby Plaintiffs were to receive an aggregate payment of $750,000 no later than January 14, 2005 (the "Settlement Due Date"). Plaintiffs subsequently received the payment of $750,000 by the Settlement Due Date, and now seek actual damages in the amount of $225,000.

b.    <u>Prejudgment Interest</u>- Plaintiffs are entitled to prejudgment interest at a rate of 10% pursuant to Conn. Gen. Stat. § 37-3a, in a total amount of $531,404.34, calculated as follows:

i.    For the period up to the Settlement Due Date, September 7, 1999 to January 14, 2005, 10% of $975,000, which is $97,500 per year or $267.12 per day, multiplied by 5 years and 128 days, resulting in interest due in the amount of $522,219.98; and

ii.    For the period after the Settlement Due Date, January 14, 2005 to June 10, 2005, 10% of $225,000, which is $22,500 per year or $61.64 per

day, multiplied by 149 days, resulting in interest due in the amount of $9184.36.

3.    Plaintiffs also seek an award of punitive damages as permitted under § 42-410g (a). Defendants' instigation of and extensive involvement in the fraudulent loan transaction, as substantiated at pages B0065-70 of the FBI report attached as Exhibit 1 to the Carroll Declaration, evidences Defendants' willful and knowing intent to deceive and defraud Plaintiffs. Defendants' intentional conduct in violation of CUTPA entitles Plaintiffs to recover punitive damages. *See Gervais v. O'Connell, Harris & Associates, Inc.*, 297 F. Supp. 2d 435, 440 (D. Conn. Dec. 23, 2003) (finding defendants' willful deception warranted an award of punitive damages under CUTPA in amount equal to twice plaintiff's actual damages.)

4.    A reasonable measure of punitive damages is the amount of the expenses Plaintiffs have incurred in pursuing this litigation, including attorneys' and experts' fees and disbursements. Although CUTPA allows for a separate award of attorneys' fees and reasonable costs under §42-110g (d), such fees must be allocable to the CUTPA claim. *See Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 128-130 (2d Cir. 2004). Plaintiffs cannot allocate any time spent litigating its CUTPA claims against Defendants, because Defendants failed to appear in this action. Nonetheless, Plaintiffs have incurred expenses in the amount of $527,985.66 as a direct result of the fraudulent mortgage loan transaction instigated by Defendants' fraud and unfair trade practices, a detailed calculation of which is included in Exhibit 2 to the Carroll Declaration.

Wherefore, Plaintiffs move that a default judgment enter against Defendants as follows:

| | |
|---|---|
| Actual Damages | $  225,000.00 |
| Prejudgment Interest | 531,404.34 |
| Punitive Damages | 527,985.66 |
| Total | $ 1,284,390.00 |

PLAINTIFFS
OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY

By: _____

Frank J. Silvestri, Jr., Esq.
Federal Bar No: ct05367
Madeleine F. Grossman, Esq.
Federal Bar No.: ct05987
LEVETT ROCKWOOD P.C.
33 Riverside Avenue
P.O. Box 5116
Westport, CT  06881
Telephone: (203) 222-0885
Facsimile: (203) 226-8025

## CERTIFICATION

This is to certify that a true and correct copy of the foregoing was mailed, First Class Mail, postage pre-paid, on this the 8th day of June, 2005, to the following counsel of record:

William Champlin, III, Esq.
Tyler, Cooper & Alcorn
CityPlace – 35th Floor
185 Asylum Street
Hartford, CT  06103-3488

Francis M. Donnarumma, Esq.
100 Grand Street, Suite 2F
Waterbury, CT  06702

Scott S. McKessy, Esq.
Reed Smith LLP
599 Lexington Avenue, 29th Floor
New York, NY  10022

Kenneth Sussmane, Esq.
Sussmane & Zapfel
521 5th Avenue, 28th Floor
New York, NY  10175-2199

Christopher L. Brigham, Esq.
Updike, Kelly & Spellacy, P.C.
One Century Tower
265 Church Street
New Haven, CT  06510

John Cheng
c/o Sinowest Financial Services
40 Elizabeth Street
New York, New York  10013

Sinowest Financial Services
40 Elizabeth Street
New York, New York  10013

Frank J. Silvestri

100614

EXHIBIT I

FD-302 (Rev. 10-6-95)



- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    5/7/99

MARGARET LEE consented to a proffer session in the presence of her attorney, DOMENIC R. IAMELE, Assistant United States Attorneys GREGORY WELSH and MICHAEL CUNNINGHAM; Financial Analyst (FA) THOMAS E. SIMMONS and Special Agent (SA) MAURA J. LATING from the Federal Bureau of Investigation (FBI). LEE's proffer session took place over two meetings on April 26, 1999 and May 3, 1999 at the United States Attorney's Office. LEE made the following statements:

LEE admits that her sister, NANCY CHANG, did not give LEE power of attorney to handle the obtaining of a loan using CHANG's 36 Upland Drive, Greenwich, Connecticut, property as collateral. LEE knew the property had no liens and was worth at least a million. LEE admitted to forging CHANG's name to a power of attorney document to obtain a loan. LEE admits that CHANG never received any of the proceeds of the approved loan in question. LEE denies that her daughter ANNA WANG had any role in this loan being approved but she did receive two thousand dollars of the funds. WANG was not aware of this fraudulent loan until LEE was arrested. LEE implicates JOHN CHENG from SINOWEST FINANCIAL SERVICES, New York, and CHARLES GARVIN (phonetic) as being aware that the loan was fraudulent because CHANG was not aware of the loan. LEE advised that there is no money left from the $848,000.00 received from the approved loan. LEE explained the chain of events related to this fraudulent $975,000.00 loan that was funded by EASTERN SAVINGS BANK.

LEE recalled the winter of 1997, CHANG talked about money problems. LEE talked with CHANG about getting a loan to have money and pay off some debts. CHANG lived in a home worth a million or more without liens. LEE read an advertisement in a New York Chinese newspaper for SINOWEST (full company name not recalled) located on Elizabeth Street, New York, which is actually in Chinatown. LEE calls the advertised telephone number for SINOWEST to make an appointment to visit their office. LEE talked to JOHN CHENG about a loan. She recalled his response was something to the effect, "How you found me?" She told him through the Chinese newspaper (newspaper name does not translate well into English). She told him about CHANG having a lien free property in Greenwich worth about two million. LEE continued to tell CHENG that CHANG was interested in his advertised no income

B 0062

Investigation on    4/26 & 5/3/99  at  Baltimore, Maryland

File #  29B--BA-96293                          Date dictated    5/4/99

by      FA THOMAS E. SIMMONS
        SA MAURA J. LATING:spp

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of    MARGARET LEE                              , On 4/26 & 5/3/99 Page    2

loan so CHANG could pay off debts.  CHENG was interested and set
up a meeting for CHANG and LEE to meet CHENG to discuss a loan.
CHENG was confident that CHENG could help CHANG.  LEE told him
that CHANG did have a tax lien on the property and had over
extended the credit limit on her credit card accounts.  CHENG
wanted to know if there was anyone else's name on the property.
LEE told CHENG no one else's name was on property.

LEE first went alone to meet with CHENG at the SINOWEST
office because she wanted to see him first before CHANG got
involved.  LEE recalled that there was a doorman outside CHENG's
office.  She recalled CHENG had a small office with only a few
desks.  She met with CHENG.  CHENG asked LEE to show some form of
identification.  The doorman had earlier asked LEE before he let
her into the office, "What do you want him for?" (referring to
CHENG).  She overheard men talking in Cantonese language behind a
closed door in CHENG's office.  She could only hear that they were
discussing someone coming in to make a payment in cash.  LEE was
scared based on the loud tone of their voices.

CHENG discussed with LEE that CHENG charges a high fee
for the loan processing.  CHENG would not tell LEE how high the
fees would be for handling the loan.  She did ask CHENG how much
she could borrow.  CHENG projected about a million and a half
dollars could be borrowed.  LEE told CHENG that her sister did
not need that much money. The first meeting ended with CHENG
telling LEE, "Better not go to another person. I'm the best."

CHENG insisted on meeting with CHANG.  LEE canceled two
future scheduled meetings with CHENG because she was nervous
dealing with him. She was not sure she wanted to have CHANG meet
CHENG.  LEE was aware that JOHN CHENG's family controlled the
west side of Chinatown as in organized crime. She did shop around
to other mortgage companies in the Flushing, New York, areas to
see if she could obtain a loan.  She did not seem to have a
problem getting several mortgage companies interested in granting
a loan with CHANG's two million dollar property as collateral.

LEE finally went back to CHENG's office on the third
scheduled meeting.  She did not show up for the two other
meetings.  CHENG wanted to meet with NANCY CHANG. She went alone
to see CHENG for this second meeting.  CHANG was at the time just
down the street shopping in Chinatown.  CHENG insisted on seeing

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____, On _4/26 & 5/3/99___, Page _3_

CHANG. LEE and CHENG went to get CHANG from shopping. They went
back to CHENG's office. CHENG had CHANG sign blank forms that had
real small print so she does not know what CHANG was signing.
LEE did not have her eyeglasses. LEE was nervous during this
meeting. CHENG was not explaining what was being asked to be
signed by CHENG. CHENG was provided CHANG's Social Security
Account Number and her home telephone number (area code 203,
telephone number not recalled). LEE recalled that the meeting
lasted until 5:00 or 6:00 p.m.

        CHENG called CHANG the next day to let her know that
there was no home owner's insurance on her property. CHENG said
she had pulled CHANG's credit report and found this out. CHENG
kept calling CHANG's telephone number but CHANG was not returning
his calls. CHANG was not interested in obtaining a loan with
CHENG. CHANG did agree to a home appraisal on her house. CHENG
was so "jumpy" when she was not sure if she still wanted to get a
loan. He told LEE that he had a lot of people working for him. A
female appraiser came in around December, 1997 to appraise the
interior and exterior of CHANG's home. CHENG arranged this
appraisal. LEE was there when the appraiser came to the house.
CHANG was not living at the Greenwich home at the time. CHANG
was renting the home and living in a rented room elsewhere. LEE
heard later from CHENG that he was excited about the results from
the appraisal.

        CHANG was repeatedly receiving telephone calls from
CHENG after the appraisal was complete. CHANG was no longer
interested in obtaining a loan from CHENG or anyone. CHANG did
not return any of CHENG's calls. CHANG never directly spoke with
CHENG to say "no" or "yes" to a loan. LEE had returned to her 301
Blue Bayou Drive, Kissimmee, Florida, residence. LEE cannot
recall her home phone number at the time. CHENG contacted LEE
down in Florida about the status of the loan and that CHANG was
returning calls. LEE told CHENG that CHANG was not interested in
a loan anymore. CHENG was angry with LEE not CHENG because in
LEE's opinion, CHENG looked at CHANG as too old. CHENG told LEE
to call if she needed him. She recalled that he offered a
"better deal" over the phone. At this point, LEE was interested.
She told CHENG that she was starting a fashion and jewelry
business and needed money for investment in the business. CHENG
told her that he could help her. She added that she was getting
calls from unidentified males telling her over the telephone that

B 0064

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____ , On _4/26 & 5/3/99_ Page ___4___

if she does not take the loan, then something bad will happen to
LEE. She realized that she was "getting into serious organized
crime." She feels now that CHARLES GARVIN is more dangerous than
CHENG.

Around February, 1998, LEE returned to New York and
started shopping around for a mortgage company that will offer a
better deal on a loan than CHENG. She impersonated NANCY CHANG
when she visited those mortgage companies. She recalled one
company visited was TRANSGLOBAL MORTGAGE. LEE spoke with a
JENNIE at TRANSGLOBAL who referred LEE to another person not
associated with a bank or mortgage company. LEE pretended that
she was NANCY CHANG to see if they were interested in giving her
a loan. LEE noted that this male (name unrecalled) did not seem
interested in approving a loan. She met with this male in New
York. LEE recalled when she left and was walking to her car that
the male came out and told her that he knew she was not NANCY
CHANG. LEE could only describe the male as a white male and
overweight. LEE was asked if DICK SORENSON seemed familiar to
her. LEE believes that was his name. LEE never heard anything
from TRANSGLOBAL. LEE contacted other mortgage companies in the
New Jersey and New York areas but she cannot remember the names
of the companies.

LEE realized she was getting a better deal with CHENG.
She returned to see CHENG. CHENG told LEE that the appraisal of
CHANG's property was "strong." LEE told CHENG that CHANG does not
want a loan. CHENG suggested a power of attorney document be
drafted to give LEE authority to get a loan using CHANG's
property as collateral. LEE asked CHENG, "Don't I have to get
Nancy's permission?" She had told LEE that CHANG had given LEE a
power of attorney document that was written in Chinese when CHANG
was interested in selling her house sometime in 1996-1997. CHENG
told LEE that she needed the power of attorney document drafted
in English.

CHENG told LEE that she did not have to prepare the
power of attorney. LEE was told to find an attorney in New York
or Connecticut to draft the power of attorney document. LEE did
not want to have to do this. CHENG told her that he had "another
guy who does it." CHENG told her that when the power of attorney
document is ready that he will contact her. LEE did not respond
to this power of attorney idea and left CHENG's office. CHENG

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____ , On _4/26 & 5/3/99__, Page __5__

told her something to the effect, "We help you a lot.  Maybe you
do not want to do it.  Maybe something happen to you and family."
LEE returned to Florida.

    LEE received a package from an attorney (name
unrecalled) in New Jersey.  The package contained a power of
attorney document with CHANG and LEE's name on it.  The document
stated that LEE had the authority to obtain a loan using CHANG's
Greenwich, Connecticut, property as collateral.  LEE was shown
the document by Assistant United States Attorney (AUSA)
CUNNINGHAM.  LEE confirmed that this is the document.  LEE noted
that RONALD REBA, as mentioned on the document, is the attorney
that sent the document to LEE.  The package had a return envelope
with REBA's return address.  LEE advised that GARVIN had called
LEE and told her not to mail back the signed power of attorney
document because a different version of the same document would
be mailed and get notarized.  LEE does not recall what changes
were made.  GARVIN told LEE that the first version was not good
enough.  CHENG and also GARVIN told her to get the document
notarized in Florida.  CHENG and also GARVIN, in separate phone
conversations, told LEE to mail back the signed power of attorney
document to the attorney on the self-addressed envelope.  The
document was completed except for the signatures of CHANG and
LEE.  She does not know if GARVIN knew CHANG was not aware of the
power of attorney. The attorney was RONALD REBA from New Jersey.
LEE never talked with or met REBA.  LEE may have the envelopes
that REBA sent the two versions of the power of attorney
document. These envelopes may have been in her storage.

    CHENG knew that LEE did not have CHANG's permission to
have this power of attorney and that CHANG was signing the
document.  CHANG knew nothing about the existence of the
document.  LEE advised that she did try to reach CHANG during this
time but CHANG was not speaking to LEE because LEE owed money to
CHANG for a cruise that she did not go on and paid by CHANG.

    CHENG kept calling LEE from March to April, 1998 at
LEE's Blue Bayou residence.  She also talks on the phone with a
CHARLES GARVIN (phonetic) from PARADISE MORTGAGE.  GARVIN was
working with CHENG to get a loan in the name of NANCY CHANG.  She
recalls one telephone conversation with CHENG that he could get a
loan for her assuming she was NANCY CHANG.  LEE responded to
CHENG, "I'm Margaret."  CHENG stated, "You have to be Nancy."  She

)-302a (Rev. 10-6-95)

29B-BA-96293

ontinuation of FD-302 of    MARGARET LEE _____ , On 4/26 & 5/3/99 ,Page    6

had a phone conversation with GARVIN about his charge of 2% fee.
LEE advised that she had taped telephone conversations with
GARVIN and CHENG that should be pertinent to the investigation.
She also has records that she has in a box as well as the tapes
in storage in Florida. LEE is trying to get someone to forward
these records and tapes to her attorney. She noted that she
taped the conversations after GARVIN told her that she did not
need to meet him.

LEE also got a call at her Florida residence from a
male who represented himself as a certified public accountant
(CPA) and discussed the possible loan in NANCY CHANG's name. She
assumes that CHENG referred this male to her.

LEE's daughter, ANNA WANG, drove her to a MAILBOX ETC
business in the Kissimmee, Florida, area to get the power of
attorney document notarized. ANNA did not come in with LEE. LEE
alone was able to get the document notarized by a Hispanic male
(name unrecalled). The Hispanic male notarized two copies of the
document. LEE had the Hispanic male initial next to LEE's name
to show that he had checked her identification. She left blank
the signature line for NANCY CHANG when she got the document
notarized. The notary never questioned the CHANG signature line
or why CHANG was not present. The notary did not copy LEE's
driver's license. LEE denies that her daughter knew about what
LEE was doing at the MAILBOX ETC.

LEE was advised by SA LATING that the notary public
referred by LEE is name JOSE PAGAN. PAGAN advised during an FBI
interview that he would not have notarized the documents without
two persons being present. PAGAN stated he recalled that LEE
came in with another Oriental female because LEE was a frequent
customer to his business to get stamps. PAGAN was aware that LEE
lived nearby. LEE restated that she was the only one present
before the notary public.

CHENG told LEE to sign NANCY CHANG's signature before
sending the notarized documents back to the attorney, REBA. LEE
told CHENG that NANCY CHANG was not in Florida with her. CHENG
told LEE that they cannot wait. LEE admits to forging NANCY
CHANG's signature to the power of attorney documents. LEE asked
about the call from the certified public accountant (CPA). CHENG
told her that she needed a CPA to approve the loan.

B 0067

D-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____ , On _4/26 & 5/3/99_ Page ___7___

     LEE noted she mailed one of the notarized power of attorney documents to REBA but she hand delivered the other original to CHENG in July, 1998. CHENG insisted on keeping the original instead of making a copy for his records.

     CHENG, GARVIN, CHENG's girlfriend (name unrecalled) went with LEE to the closing of the loan that was ultimately handled by a mortgage broker business named TCRM ADVISORS located in Connecticut. She had met once with SOLINSKY before this meeting. CHENG had given SOLINSKY her telephone number. CHENG told LEE what to say to SOLINSKY. They all met at the bank's closing attorney's office named M. DEAN MONTGOMERY located in Connecticut. The TCRM BROKERS' name was (First Name Unknown) SOLINSKY (phonetic). SOLINSKY was also present. The loan amount was $975,000.00 but LEE ultimately received $848,000.00. CHENG insisted to MONTGOMERY that eleven checks be made for the loan distribution. CHENG first requested cash but MONTGOMERY said "no" to cash. LEE advised that MONTGOMERY and CHENG did leave the room together after the discussion about how many checks. The check were to be all payable to NANCY CHANG. LEE denies telling MONTGOMERY or anyone else, including other mortgage companies, that CHANG was dying of cancer. MONTGOMERY told them that it would take a few days to get the checks.

     LEE was asked about the phone call made by MONTGOMERY to supposedly NANCY CHANG to confirm she knew about the loan. LEE advised that CHENG gave her several phone numbers with New York, Connecticut, and Florida telephone numbers. She gave MONTGOMERY a 407 area code number. LEE does not know who answered the phone when MONTGOMERY called. LEE had told CHENG what number she gave MONTGOMERY. LEE denied ANNA WANG impersonated NANCY CHANG during this call. LEE explained that ANNA may have said during an FBI interview that she handled this call because she was scared during this interview. LEE heard from her daughter that the FBI agent was yelling at WANG. LEE thinks WANG finally gave in and said "yes" but LEE said she did really impersonate CHANG.

     CHENG told MARGARET that she would have to stay with CHENG's girlfriend until the checks were ready to be picked up. LEE said "no." GARVIN checked LEE into a SHERATON HOTEL in "Showboat" Connecticut. GARVIN also checked in the same hotel. GARVIN paid with a credit card.

B 0068

D-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____ , On _4/26 & 5/3/99_ Page ___8___

CHENG and his girlfriend joined LEE to go to BANK OF
EAST ASIA, New York. CHENG chose BANK OF EAST ASIA to have LEE
open an account to deposit the checks from MONTGOMERY a few days
later. CHENG told her to use his girlfriend's New Jersey address
(address unrecalled). LEE opened three bank accounts at BANK OF
EAST ASIA. One account was opened in the name of CHANG and LEE.
The second account was a savings account in LEE's name. The
third account was LEE's business name, NEW STAR FASHION TRADING.

LEE and CHENG picked up the checks from MONTGOMERY a
few days after the closing of the loan. Just a couple of the
checks were deposited the same day or day after at BANK OF EAST
ASIA. CHENG still would not tell LEE the amount of CHENG's fee.
CHENG told LEE that withdrawals would be in cash. CHENG did not
want her to deposit all the checks on the same day. CHENG had
LEE open a safe deposit box at BANK OF EAST ASIA to hold the
remaining checks until CHENG told her to make another deposit.
CHENG held the key to that safe deposit box. CHENG and/or his
girlfriend joined LEE for the deposits and withdrawals.

LEE recalled one large withdrawal of cash that they all
went back to CHENG's office and split the money.

LEE advised that bank records will reflect that there
is an official bank check payable to JOHN CHENG's business,
SINOWEST FINANCIAL, for $50,000.00. CHENG wanted cash but LEE
insisted on the bank check because CHENG wasn't going to give LEE
a receipt for payment of his fee. LEE gave him another
$135,000.00 after a large withdrawal from her account. She also
withdrew $120,000.00 one day and was on her way to see JOHN
CHENG. She was robbed by a Chinese male going down a street in
Chinatown. LEE was able to grab $27,000.00 before the robber ran
away. LEE thinks CHENG sent this Chinese male to rob her because
he knew she was going to the bank. LEE added, "I can't prove it."

LEE was contacted by a female from EASTERN SAVINGS
BANK, Baltimore, Maryland, about automatic withdrawal payment
arrangements of $12,400.00 a month for the loan. LEE first found
out about EASTERN SAVINGS BANK being the bank when she was
contacted by the female. LEE mailed via FEDERAL EXPRESS a BANK
OF EAST ASIA starter check from her business account to the
female employee at EASTERN SAVINGS BANK. LEE thought the name of
SUSAN SCHROCK sounded familiar once provided by SA LATING. LEE

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of  MARGARET LEE _____ , On 4/26 & 5/3/99 Page 9

kept sufficient funds to cover the automatic withdrawals until May 1, 1999. She was going to deposit additional funds from profits made on her jewelry business. She had made contracts with PEARL SUPPLIERS and expected payments from them by May, 1999.

LEE advised that she changed safe deposit boxes at BANK OF EAST ASIA because she did not like that JOHN CHENG had a key to the box. She told the bank she lost her key and they changed her box number. CHENG was not too happy.

LEE admitted that CHANG never received any funds from the loan. CHANG had no idea her property was used as collateral. LEE recalled that CHENG said that a year later, the bank would auction the house. LEE told him that would not happen.

CHANG was aware that LEE was trying to get a loan in CHANG's name from the beginning of 1997 until the summer of 1998 when CHANG did not want a loan or sell the house. From the summer of 1998 to the present, CHANG had no idea what was going on. LEE claims that CHANG gave her the CHANG's driver's license and Social Security card to be copied.

LEE explained how she spent the loan proceeds. She deposited $190,000.00 into BANK OF EAST ASIA, Hong Kong, and obtained a check and bought a jade stone. She invested $417,000.00 in a pearl contract with a China business for $200,000. She spent 40 carats of ruby and sapphires, 10-15 pieces worth $200,000. She had a BANK OF TAWAIN account with $29,500.00 balance. She has since used this $29,500 to pay back her ex-husband, HSU LEE. She gave $2,000.00 to ANNA WANG for being there for her when she was sick. She also bought wine and gifts for her business customers. The safe deposit box is empty at BANK OF EAST ASIA. LEE denied gambling any of the stolen funds. LEE was advised that her credit report reflects gambling debts in Reno, Nevada, being charged off by casinos. She said that was years ago when she was entertaining Chinese customers and they wanted to gamble so she advanced money to them to gamble and was not paid back.

ANNA WANG bought a house in Las Vegas, Nevada with money she saved working at RED LOBSTER. She is not working anywhere now. LEE claims there is a mortgage on the house. LEE

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of ___MARGARET LEE_____ , On _4/26 & 5/3/99_, Page ___10___

denies giving money to WANG to buy the house.

LEE's address book has "Katy (John-Sinowest) #732-287-
4344." LEE thinks this is CHENG's girlfriend. There is also a
reference to "Charles" under the SINOWEST FAMILY COMPANY, 212-
965-1100, which states "Charles 908-610-6694." LEE advised this
is CHARLES GARVIN's telephone number. She describes CHENG's
girlfriend as a white female, age 20-30's, short hair, and short
in height.

LEE never saw CHARLES GARVIN or CHENG carrying weapons.
She noted that they would both stand with their hands in their
pockets. GARVIN once talked to LEE about a person that he had
that handles the collection of money. LEE mentioned that CHENG
wanted LEE to invest in CHENG's business and get a 25% return on
her investment. LEE said "no."

CHENG's family control the west side of Chinatown in
New York. LEE could not provide any other details about CHENG or
possible criminal activity by SINOWEST or the CHENG family.

B 0071