Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY, and OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY as Subrogee of Eastern
Savings Bank,

        Plaintiffs,

      -vs-                3:01CV.1772(SRU)

BANK OF EAST ASIA LIMITED, M. DEAN
MONTGOMERY, ESQ., BENTLEY MOSHER BABSON
& LAMBERT, P.C., MARGARET L. LEE, JOHN
CHENG, SINOWEST FINANCIAL SERVICES and
TCRM ADVISORS, INC.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

CHARLES J. GOVERN

November 10, 2006
10:50 a.m.

Sheraton Hotel
Route 35 and Industrial Way
4th Floor, Room 4241
Eatontown, New Jersey

Betty Ann Wasilewski, Certified Shorthand Reporter, License No. XI01032,
Registered Professional Reporter, Certificate of Merit Holder and
Notary Public of the State of New Jersey

```
 1                              APPEARANCES:

 2           .

 3           FOR THE PLAINTIFFS.

 4           LEVETT ROCKWOOD, P.C.

 5           FRANK J. SILVESTRI, JR., ESQUIRE

 6              33 Riverside Avenue

 7              Westport, Connecticut  06880

 8           .

 9           FOR THE DEFENDANTS, JOHN CHENG AND SINOWEST

10           FINANCIAL SERVICES.

11           HALLORAN & SAGE, LLP

12           MICHAEL K. STANTON, JR., ESQUIRE

13              315 Post Road West

14              Westport, Connecticut  06880-4739

15           .

16           .

17           .

18           .

19           .

20           .

21           .

22           .

23           .

24           .

25           .
```

1       Deposition of Charles J. Govern

2              November 10, 2006

3                   (Notice of Deposition was received

4       and marked as Defendant Exhibit-A for

5       identification.)

6                   (Power of Attorney was received and

7       marked as Defendant Exhibit-B for

8       identification.)

9                   (Federal Bureau of Investigation

10      Transcription dated 5/7/99 was received and

11      marked as Defendant Exhibit-C for

12      identification.)

13                  CHARLES J. GOVERN, having been

14      first duly sworn, testified as follows:

15         EXAMINATION

16         BY-MR.STANTON:

17         Q.    Mr. Govern, good morning.  My name

18      is Mike Stanton.  We have spoken on the

19      phone.

20         A.    Uh-huh.

21         Q.    I represent two parties in a

22      litigation called Old Republic National Title

23      Insurance Company vs. Bank of East Asia,

24      Limited, et al.  My clients are part of the

25      et al., John Cheng and Sinowest Financial

Page 4

1    Services.

2              We're here today for a deposition.

3    Have you ever been deposed before?

4         A.    Yes.

5         Q.    So you understand the process of

6    the question and answer.  Please do your best

7    to answer the questions audibly so the

8    reporter can take your responses down.

9              If you don't understand a question

10   I ask, please let me know.  I'd be happy to

11   rephrase it.

12             If you need a break, tell me that

13   and we'll be happy to accommodate you

14   whenever you need.

15             First of all, thank you for

16   coming. You're here today as nonparty witness

17   to this proceeding voluntarily, and I

18   forwarded to your attention a Notice of

19   Deposition, but I, nonetheless, thank you for

20   coming and taking time out of your day.

21             Can you tell me, please, Mr.

22   Govern, where do you live?

23        A.    1418 Pippin Drive, Manasquan, New

24   Jersey.

25        Q.    And are you married, sir?

1          A.      Widower.

2          Q.      And do you have children?

3          A.      Yes.

4          Q.      Where are you employed currently?

5          A.      America's First Funding Group.

6          Q.      And what kind of business is that?

7          A.      Mortgage.

8          Q.      And when you say "mortgage," could

9     you describe a little bit about the business

10    of America's First Funding Group?

11         A.      New and refinance of purchased

12    mortgages.  Retail.

13         Q.      When you say "retail," you mean

14    for individual borrowers and family?

15         A.      Individual -- yes.

16         Q.      Okay.  And do you engage in

17    commercial transactions as well, when I say

18    commercial loans?

19         A.      No.

20         Q.      And then how long have you been

21    involved in this business?

22         A.      It's got to be about 10 years, 10

23    or 11 years.

24         Q.      And prior to being affiliated with

25    America's First Funding Group, where were you

1        employed?

2              A.    Paradise Mortgage.

3              Q.    And how long were you associated

4        or affiliated with Paradise Mortgage?

5              A.    I guess about five years.

6              Q.    And referring now to America's

7        First Funding Group, what is your position?

8        Do you have a job title?

9              A.    Loan officer.

10             Q.    And what was your position with

11       Paradise Mortgage?

12             A.    Loan officer.

13             Q.    And what were your duties as a

14       loan officer for Paradise Mortgage?

15             A.    Originate mortgages.

16             Q.    And when you say "originate,"

17       you're selling the product of the loan?

18             A.    Correct.

19             Q.    And in connection with that

20       exercise, were you involved in the

21       administration of that loan and doing what is

22       necessary to move that loan to a closing, a

23       given loan to a closing?

24             A.    Just -- just sub-prime.  There was

25       a difference between A loans and -- and

1          sub-prime loans. Sub-prime, I would handle,

2          myself.

3              Q.    And why is that?

4              A.    Because each sub-prime loan was

5          different.  It was -- it was -- it was

6          almost like a glue together -- it was always

7          -- a sub-prime was like bad credit so it was

8          more -- it wasn't like an A loan, Fannie Mae

9          or FHA where it went through a certain

10         process and everything was the same.

11             Q.    Fair to say that it required more

12         handling and care?

13             A.    Right.

14             Q.    Okay.

15             A.    Correct.

16             Q.    And are those duties, as you

17         described them, also applicable to America's

18         First Funding?

19             A.    Correct.

20             Q.    And when you were with Paradise

21         Mortgage, where did you maintain your office?

22             A.    It was on Craig Road in Freehold.

23         I can't remember the number.

24             Q.    And where do you presently maintain

25         your office?

1           A.     Just recognizing their name.  I

2      don't think I ever dealt with them.

3           Q.     Do you know a gentleman named John

4      Cheng, my client, C-H-E-N-G?

5           A.     Yes.

6           Q.     And how is it that you know Mr.

7      Cheng?

8           A.     I believe Mr. Cheng was a -- a

9      commercial lender, a commercial mortgage

10     company, and I guess -- I met him probably

11     through guys in the office that did

12     commercial work.

13          Q.     Through Paradise?

14          A.     Through Paradise, yeah.

15          Q.     And when you say you met him, do

16     you remember when you met him approximately

17     for the first time?

18          A.     No.  It had to be that -- you

19     know, when I got in the business, I guess,

20     when I first got in the business.

21          Q.     And when was it that you first got

22     into the business?

23          A.     I believe it was 1997.

24          Q.     And prior to getting into the

25     mortgage business in 1997 approximately, what

1           work did you do before then?

2               A.    I was a general manager, automobile

3           business.

4               Q.    Are you familiar with a company

5           called or an entity called Sinowest,

6           S-I-N-O-W-E-S-T, Financial Services?

7               A.    Well, I am now because I read it

8           on the paper.

9                     If it was before I read that, I

10          wouldn't have recognized the name.

11              Q.    Do you know a gentleman named

12          Ronald Reba?

13              A.    Yes.

14              Q.    How is it that you know Ronald

15          Reba, R-E-B-A?

16              A.    Ronald Reba was an attorney that I

17          used for my transaction before I was even in

18          the mortgage business from when I purchased

19          my house.

20              Q.    He was your personal attorney?

21              A.    He was my personal attorney, and

22          he was a real estate attorney.  So when I

23          got into the mortgage business, I approached

24          him about doing business, and he would give

25          me some business; I would give him business.

Page 19

```
1              I still know him.
2                    I mean, I -- you know, it's been
3              -- live in the same area.
4              Q.    In connection with your efforts to
5              secure a refinance approval for Ms. Chang,
6              did you have an occasion or a need to deal
7              with Mr. Reba?
8              A.    Yes.
9              Q.    And could you describe what it is
10             that you needed to talk to him about?
11             A.    Somewhere when I was working the
12             deal, somewhere on the line, I needed -- they
13             wanted a Power-of-Attorney, because of the
14             situation with this woman being in the
15             hospital or wherever she was.
16                   So I had to get a
17             Power-of-Attorney, but they wanted it from a
18             New Jersey attorney because my company was in
19             New Jersey.
20             Q.    When you say "they," who is it
21             that wanted it?
22             A.    I can't -- I really can't remember
23             if it was Ocwen or Eastern.  It was one of
24             the big hard money investors.
25             Q.    And did Mr. Cheng have any role in
```

1          seeking a Power-of-Attorney document from you?

2               A.    No.

3               Q.    Did anyone from Sinowest Financial

4          Services have a role in asking for a

5          Power-of-Attorney document?

6               A.    No.

7               Q.    All right.  So to the best of

8          your recollection, Eastern or Ocwa (sic) (ph),

9          one of your investors --

10              A.    Ocwen.  Somebody wanted a

11         Power-of-Attorney because the people -- because

12         of the situation of the deal; that the woman

13         was in the hospital and the home was in -- I

14         can't remember -- Upstate New York or

15         something, and our company was in New Jersey.

16                   So I had to get a New Jersey

17         attorney to do a Power-of-Attorney, so that

18         they would certify that every -- all the

19         information on the application was correct.

20                   So I called the attorney who I was

21         dealing with, you know, I was trying to get

22         business with back and forth, and asked him

23         if he would do it.

24              Q.    Referring to Mr. Reba?

25              A.    Correct.  So he took care of the

1      Power-of-Attorney.

2           Q.    Well, let me try to walk you

3      through it --

4           A.    Go ahead.

5           Q.    -- to the extent you remember it

6      or not remember it.

7                 Did you ask him one-on-one to do

8      it? Did you call him?  Did you write to him?

9           A.    No.  I'm sure I called him.

10          Q.    Okay.  And what did he say when

11     you asked him?

12          A.    Well, I guess he said yes because

13     we ended up with it but I guess he wanted to

14     talk -- he had to handle it through the

15     clients, whoever he had to handle it with.

16          Q.    Okay.

17          A.    And I guess with the -- you know,

18     I don't think the investor, but I guess he

19     had to be -- no.  Wait a minute.  He

20     couldn't have handled it with the -- I think

21     he just had to draw it up.  That's right,

22     because I think he had to send it to

23     Florida.

24          Q.    Mr. Reba did?

25          A.    Right.

1       Q.    Okay.

2             A.    And they would note -- or the

3       company did.  Maybe the company did.  I

4       don't even know if he did it.  I think his

5       role was just to prepare it and then the

6       company or, I guess, the investor probably

7       sent it to Florida to be notarized with the

8       people -- with, you know, the woman in

9       Florida.

10      Q.    Let me show you --

11            A.    Yeah, I think that's all he had to

12      do was prepare -- go ahead.

13      Q.    I don't mean to interrupt.  Is

14      there anything else you want to add on that?

15            A.    No.  I just --

16      Q.    Let me show you what's been marked

17      as Defendant's Exhibit B, and, for the

18      record, it's a Power-of-Attorney document

19      bearing a book end page number reference

20      referring to a land records filing. The first

21      one is -- and I'm doing this for the

22      stenographer, Mr. Govern -- it's Book 3159,

23      page 0199 as the first page.

24                  Mr. Govern, have you seen this

25      document before today?

1            A.    If I did, I don't remember.  It's

2      a long time ago.

3            Q.    Now, in looking at it, the person

4      identified as the principal is Nancy L.

5      Chang, correct?

6            A.    Correct.

7            Q.    And the agent identified in that

8      document, or at least the person described as

9      the agent is Margaret L. Lee; do you see

10     that?

11           A.    Correct.  Yes.

12           Q.    Does that refresh your recollection

13     or jog your memory as to whether or not Ms.

14     Lee was involved in this transaction?

15           A.    No, I don't have a clue.

16           Q.    Now, you --

17           A.    No, I don't know who --

18           Q.    You stated before --

19           A.    -- Margaret Lee and Nancy Chang --

20           Q.    I'm sorry.  I don't mean to cut

21     you off. Is there something you want to add?

22           A.    No.  I'm just -- I'm talking to

23     myself. Go ahead.

24           Q.    Why don't you take your time and

25     read it if you'd like.

1          A.    Okay.  Go ahead.

2          Q.    There's what appears to be a

3    signature above typed words, Nancy L. Chang.

4    Do you see that?

5          A.    Okay.

6          Q.    And on the document there appears

7    to be two signatures there at the bottom, in

8    addition to the notary from Florida.

9                Do you recognize either of those

10   two signatures?

11         A.    No.

12         Q.    Did you ever have occasion or the

13   opportunity to meet Nancy Chang one-on-one,

14   in-person?

15         A.    No, no.

16         Q.    Did you ever meet a lady by the

17   name of Margaret Lee?

18         A.    No.

19         Q.    Before Mr. Reba prepared a

20   Power-of-Attorney document, did he indicate to

21   you that he was sending it down to Florida?

22         A.    I can't remember.

23         Q.    Did he ever tell you that he did

24   it; that he prepared the document?

25         A.    I knew that he prepared it.  Yeah,

1          I knew he prepared it.

2              Q.    And to the best of your knowledge,

3          he -- either he or the investor forwarded it

4          for execution; is that right?

5              A.    Correct.

6              Q.    And as you sit here today, do you

7          recall that document ever being forwarded back

8          to you to your attention?

9              A.    To me personally?

10             Q.    Yes.

11             A.    I don't know.

12             Q.    Now, the date on this document, at

13         least on the front page of it, is June 22 of

14         1998.  Using that date as a point of

15         reference, at any point from -- strike that.

16                   What happened after June of 1998

17         with respect to this proposed loan

18         transaction?

19             A.    I couldn't get it approved.

20             Q.    Do you remember why not?

21             A.    Why not?

22             Q.    Yes.

23             A.    It was just --

24             Q.    Do you remember what happened?

25             A.    They wouldn't -- they wouldn't do

1              the loan for me.  It was just too -- it was
2              -- it was just too peculiar.
3                      I mean, here, the woman was dying.
4              She was trying to borrow $1 million, you
5              know, and -- and it just -- it didn't make
6              sense.  They just wouldn't do it, you know,
7              and I remember I really tried hard on this
8              loan because of the amount of it, you know,
9              and I couldn't get it -- I couldn't get it
10             done anyway.
11                 Q.    It's fair to say that you would
12             have earned a desirable commission --
13                 A.    Oh, yes.
14                 Q.    -- if you were able to close it?
15                 A.    Yes, yes, yes.
16                 Q.    Do you remember approximately what
17             that rate of commission would have been for,
18             say, a million-dollar loan in 1998?
19                 A.    On a hard money loan like that, it
20             would have probably been at least 2 percent.
21                 Q.    2 percent of the loan amount?
22                 A.    Sure.
23                 Q.    When you say "hard money," are you
24             referring to the fact that it was a sub-prime
25             loan?

1          transaction finally?

2               A.    Repeat that, please.

3               Q.    Sure.

4               A.    Go ahead.

5               Q.    It was a bad question.

6          Eventually, a loan transaction or a refinance

7          transaction was closed, correct?

8               A.    Correct.

9               Q.    Were you involved in the successful

10         refinance transaction, the one that closed?

11              A.    No.

12              Q.    And so it's fair to say that you

13         did not attend a closing for that refinance

14         transaction?

15              A.    No.

16              Q.    Okay.

17              A.    And I read that.  I think

18         that's --

19              Q.    Well, let's mark -- or, rather,

20         let me refer to you -- you to Exhibit C.

21         It's an example or -- rather, for the record,

22         it's a Federal Bureau of Investigation proffer

23         statement made by Margaret Lee.

24                   Now, Mr. Govern, you said:  I read

25         that. You were referring to this proffer

1          statement, correct?

2                A.    Correct.

3                Q.    And I sent it to you recently,

4          copying Mr. Silvestri on that letter, correct?

5                A.    Correct.

6                Q.    Before coming here today, did you

7          have the opportunity to read this document?

8                A.    Yes.

9                Q.    And I would ask that you page

10         through it and make sure that this document

11         is a copy of what's provided to you

12         previously and, again, for the record, it's

13         10 pages.

14               A.    Yes.

15               Q.    Have you ever been known by a

16         name, other than Charles Govern?

17               A.    No.

18               Q.    So it's fair to say you've never

19         been known as Charles Garvin, G-A-R-V-I-N?

20               A.    No.

21               Q.    This proffer statement makes

22         reference to John Cheng somehow involving you

23         in this transaction; is that an accurate

24         statement?

25               A.    Yes.

1           Q.    And how -- do you remember him

2      calling you about it?

3           A.    About this file?

4           Q.    No, about this loan transaction,

5      about him referring the Nancy Chang loan to

6      you.

7           A.    No.

8           Q.    Oh, your answer "yes" was simply

9      that it's reflected in this document, correct?

10          A.    Yes, yes.

11          Q.    So it's a false statement that he

12     referred this loan to you?

13               MR. SILVESTRI:  Object to the

14     form.

15               THE WITNESS:  Yeah.  I -- you

16     know what? Honestly, I can't remember, but, I

17     mean, I really honestly don't remember who

18     referred it to me, but I think if I was

19     involved the way that this told me I was

20     involved, I think I would have some

21     recollection of it, but I really don't.

22               I mean, I think I would remember

23     if I was flying all over the country to do

24     this loan.

25               I mean, I never got out of my