1          office with it.

2              BY MR. STANTON:

3              Q.    And your office was located where

4          at the time?

5              A.    In Craig Road in Freehold, New

6          Jersey.

7              Q.    In referring to the second

8          paragraph on page 1 of Exhibit C, the

9          sentence that leads off that paragraph reads,

10         I quote:  Lee admits that her sister, Nancy

11         Chang, did not give Lee --

12             A.    I'm sorry.  Wait.  What page?

13             Q.    I'm referring to page 1.

14             A.    Oh.  Page 1.  I'm sorry.  Here.

15             Q.    The second full paragraph.

16             A.    Okay.  Go ahead.

17             Q.    That that sentence, that first

18         sentence reads:  Lee admits that her sister,

19         Nancy Chang, did not give Lee

20         Power-of-Attorney to handle the obtaining of a

21         loan using Chang's 36 Upland Drive, Greenwich,

22         Connecticut property as collateral.

23                  At any point in time were you made

24         aware that the Power-of-Attorney was forged by

25         Margaret Lee?

1           A.    No.

2           Q.    At the time that you were seeking

3     to have the Power-of-Attorney document

4     executed, is it fair to say that, as far as

5     you knew, that document was going to be

6     executed by Ms. Chang in the normal course?

7           A.    Yes.

8           Q.    Okay.

9           A.    Well, it had to be done with a

10    notary, you know, the whole -- the whole, you

11    know, legal way, however they were going to

12    do it.

13          Q.    At any point in time, did you

14    travel to Florida to meet with Ms. Lee or

15    Ms. Chang?  There is a reference --

16          A.    No.

17          Q.    -- in this proffer statement to an

18    address of Blue Bayou Drive in Kissimmee.

19          A.    No.

20          Q.    Did you ever become aware that

21    that's where Ms. Chang resided or purportedly

22    resided in Kissimmee, Florida?

23          A.    I don't -- you know what?  I

24    mean, thinking back at it, I don't know,

25    maybe I thought the property was in Florida

1          to begin with, so until I read all this --

2          or Upstate New York, now I read it was in

3          Connecticut.

4                    So I just remember that the woman

5          was in a hospital or a hospice in Florida

6          and that's what the whole difficulty with the

7          deal was, the difficulty that I was having

8          getting it approved.

9          Q.     Do you remember who it was that

10         told you that Ms. Chang was ill?

11         A.     I guess whoever I spoke to to do

12         the loan, which was either -- it was either

13         the sister or the -- or the -- yeah, it

14         couldn't have been the -- well, no.  No, it

15         couldn't have been the woman because the

16         woman wouldn't be calling me and telling me

17         that she was sick in Florida.  It had to be

18         the -- you know, her sister.

19         Q.     I'm going to refer you, please, to

20         page 5 of that proffer statement.

21                   About midway through the first full

22         paragraph, there's a sentence that reads,

23         quote:  Lee advised that Garvin had called

24         Lee and told her not to mail back the signed

25         Power-of-Attorney document because a different

1        version of the same document would be mailed

2        and get notarized.

3                 Do you see that sentence?

4           A.    Yes.

5           Q.    And just assuming for the moment

6        that by the word "Garvin" she's referring to

7        you, do you recall that if, in fact, this

8        occurred, if it happened this way?

9           A.    I have no idea.

10          Q.    Did you ever get involved in

11       discussing with Lee a different replacement

12       version of a Power-of-Attorney?

13          A.    I have no idea.  I mean, I assume

14       that if I had to get the Power-of-Attorney, I

15       would have had to discuss it with her to get

16       it handled, but I don't know if there was

17       one or two or three.

18                 I mean, I really don't know.

19          Q.    Did Lee ever tell you that she,

20       Lee, signed that document, rather than Chang?

21          A.    I don't think so, because I don't

22       know the difference between Lee and Chang.

23                 So, I mean, I don't think one

24       would say -- Power-of-Attorney was made so

25       that the woman who owned the house could

1        certify that the information she gave us was

2        correct.

3            Q.    As far as you were concerned, that

4        was Nancy Chang, correct?

5                MR. SILVESTRI:  Object to the

6        form.

7                THE WITNESS:  I just want to make

8        sure she's the owner before I say that.  Is

9        she the owner of the property, Nancy Chang?

10           BY MR. STANTON:

11           Q.    Well --

12           A.    Nancy Chang.

13           Q.    -- I can only refer you back to

14       the Power-of-Attorney, itself.

15           A.    Oh, all right.  Yeah, Nancy Chang.

16       Yeah, Nancy Chang.  Okay.

17           Q.    So as far as you know, who was

18       the owner of the property?

19           A.    Nancy Chang.

20           Q.    And it was Nancy Chang who, as far

21       as you knew, signed the Power-of-Attorney,

22       correct?

23                MR. SILVESTRI:  Object to the

24       form.

25                THE WITNESS:  Correct.

```
 1              BY MR. STANTON:
 2              Q.    I want to refer you, Mr. Govern,
 3         please, to page 7 of that proffer statement.
 4         You'll note that in the second full
 5         paragraph, there's a notation that my client,
 6         Mr. Cheng, someone identified as, quote,
 7         Chang's girlfriend, and, again, referring to
 8         Garvin, to you, that you went to a closing
 9         of the loan in Connecticut.
10                   Is that a correct -- is that an
11         accurate statement?
12              A.    No.
13              Q.    It's fair to say that you never
14         went to Connecticut for a loan transaction?
15              A.    Never went to Connecticut.
16                   MR. SILVESTRI:  Object to the
17         form.
18                   MR. STANTON:  What's wrong with
19         the form?
20                   MR. SILVESTRI:  Leading.
21              BY MR. STANTON:
22              Q.    I'll rephrase it and clean it up.
23         Did you ever go to Connecticut for a loan
24         transaction accompanied by John Cheng?
25              A.    No.
```

Page 39

1          Q.    Did you ever go to Connecticut in

2     1998 for the closing of a refinance loan

3     transaction with a lady who you knew to be

4     John Cheng's girlfriend?

5          A.    No.

6          Q.    In 1998, did you ever attend a

7     loan transaction, refinance transaction that

8     closed in Connecticut?

9          A.    No.

10         Q.    In 1998, did you work with or in

11    connection with a brokerage entity called TCRM

12    Advisors?

13         A.    No.

14         Q.    If you look, please, Mr. Govern,

15    at the bottom of that page, page 7, the last

16    full paragraph, and, again, assuming for the

17    moment that the person identified in this

18    document as Garvin refers to you, did you

19    ever check Lee into a Sheraton Hotel in

20    Connecticut?

21         A.    No.

22         Q.    Did you ever -- strike that.

23              In 1998, did you ever stay at a

24    hotel in Greenwich, Connecticut?

25         A.    No.

Page 40

1          Q.    In 1998, did you ever stay the

2          night in any hotel in the State of

3          Connecticut?

4               A.    No.

5               Q.    In 1998, did you use your credit

6          card to pay for a hotel room in Greenwich,

7          Connecticut?

8               A.    No.

9               Q.    So it's fair to say that last

10         paragraph is false?

11                    MR. SILVESTRI:  Object to the

12         form.

13                    THE WITNESS:  Yes.

14         BY MR. STANTON:

15              Q.    Is that last paragraph false?

16              A.    Yes.

17              Q.    Referring, please, Mr. Govern, to

18         page 10 of the proffer statement, the last

19         page, in 1998, did you have a cell phone?

20              A.    Yes.

21              Q.    Do you recall what the phone

22         number for your cell phone was then?

23              A.    No.

24              Q.    I realize that's perhaps a

25         difficult question.

Page 45

1              Do you remember the name of any

2         person at that bank you may have dealt with?

3              A.   No.

4              Q.   All right.  So you could only

5         recall it being either Ocwen or Eastern,

6         correct?

7              A.   Correct.

8              Q.   Is it fair to state that, as you

9         sit here today, that as far as you knew, the

10         Power-of-Attorney document that was to be

11         executed was to be a bona fide transaction

12         and would be used as part of the refinance

13         transaction with Nancy Chang's consent?

14              MR. SILVESTRI:  Object to the

15         form.

16         BY MR. STANTON:

17              Q.   You could answer it.

18              A.   Yes.

19              Q.   And just to put it plainly and

20         finish up, Mr. Govern, did you have any role

21         whatsoever in knowingly assisting Margaret Lee

22         in committing a fraudulent transaction on a

23         lender?

24              A.   No.

25              Q.   All right.

```
1                    MR. STANTON:  Okay.  I have no
2              further questions at this time.  Thank you
3              for your time.
4                    THE WITNESS:  Thank you.
5              EXAMINATION
6              BY-MR.SILVESTRI:
7              Q.    I get a turn, Mr. Govern.
8              A.    Go ahead.
9              Q.    My name is Frank Silvestri and I
10             represent Old Republic.
11                   MR. STANTON:  Do you want to
12             switch?
13                   MR. SILVESTRI:  Yeah.
14                   MR. STANTON:  Let's go off the
15             record a minute.
16                   (Discussion off the record.)
17                   MR. SILVESTRI:  Would you mark
18             this, please?
19                   (Open-End Mortgage Deed was
20             received and marked as Exhibit-P-1 for
21             identification.)
22              BY MR. SILVESTRI:
23             Q.    Mr. Govern, I'm showing you what's
24             been marked as Plaintiff's Exhibit 1.  It's
25             the open-end mortgage deed from Nancy L.
```

1       Chang by Margaret L. Lee, her attorney-in-fact

2       to Eastern Savings Bank for $975,000 given on

3       October 2, 1998.

4                   Have you ever seen this before?

5           A.    No.

6           Q.    Would you look at page 6?  Would

7       you look at the witnesses?

8           A.    Go ahead.

9           Q.    Is that your signature?

10          A.    No.

11                  MR. STANTON:  Is that a no?

12                  THE WITNESS:  That's no.  No.

13          BY MR. SILVESTRI:

14          Q.    Do you have any idea why somebody

15      would have written -- printed your name and

16      purported to make a signature on this

17      mortgage deed?

18          A.    I don't know.  I don't know.  No.

19          Q.    How did it come about that you

20      were contacted for this deposition?

21          A.    Mr. Stanton contacted me.

22          Q.    Have you spoken with Mr. Chang at

23      any time this year about this case?

24          A.    No.

25          Q.    When's the last time you spoke

Page 48

1      with Mr. Chang?

2          A.     I don't know.  Quite a while ago.

3      When was this, March 12?

4          Q.     When did you first meet Mr. Cheng?

5          A.     Probably when I first got into the

6      mortgage business.  Probably like 1997 or

7      1998.

8          Q.     And what conversations did you have

9      with him about the mortgage loan that is at

10     issue in this case?

11         A.     I don't think I ever had any with

12     him about this deal.  I don't think he was

13     ever involved in this deal with me.

14                I met Mr. Cheng because he came to

15     Paradise Mortgage.  I was introduced to him

16     by the owner as a -- an outlet for

17     commercial loans.

18         Q.     Did you ever meet Mr. Cheng's

19     girlfriend, Katie Perry?

20         A.     No.

21         Q.     How long did you do business with

22     Mr. Cheng?

23                MR. STANTON:  If he did.

24                THE WITNESS:  I don't think I ever

25     did. I don't think I ever had a loan that

```
 1          flew, yeah.  You know, a commercial -- you
 2          know, I didn't deal in commercial, you know,
 3          so I don't think I ever had one.
 4          BY MR. SILVESTRI:
 5          Q.     Let me ask a little bit of a
 6          different question then.  For how long did
 7          you have any contacts with John Cheng?  You
 8          said you started -- you met him in '90 --
 9          A.     The only contacts I ever had was
10          when he would come into the office once in a
11          while, you know, to see the owner, talk to
12          the sales reps.
13          Q.     What office are you talking about,
14          Paradise?
15          A.     Paradise, yeah.
16          Q.     Have you had any contacts with Mr.
17          Cheng since you've been at America's First
18          Funding Group?
19          A.     No.
20          Q.     When was the first time that you
21          were aware of this lawsuit involving this
22          particular mortgage?
23          A.     I guess when Mr. Reba told me.
24          Well, no.  Actually, no, that's not true
25          because I didn't know it was a lawsuit.  I
```

Page 50

1          guess when Mr. Stanton called me.

2              Q.    Have you ever discussed anything

3          about this lawsuit with Mr. Cheng?

4              A.    No.

5              Q.    Have you discussed the fact that

6          you were asked to give a deposition with Mr.

7          Reba?

8              A.    Yes, I did.  I did.  I think I

9          did mention that to him.  He told me he

10         couldn't talk -- he's a judge now so he

11         couldn't really discuss it with me.

12             Q.    So he didn't act as a lawyer for

13         you?

14             A.    No.

15             Q.    Did he say anything else about the

16         situation?

17             A.    No.

18             Q.    Mr. Stanton showed you a phone

19         number in Exhibit --

20                   MR. STANTON:  C.

21         BY MR. SILVESTRI:

22             Q.    -- C on the last page; that's the

23         Margaret Lee statement?

24             A.    Uh-huh.

25             Q.    Would you take a look at that?

Page 51

1           A.      Uh-huh.

2           Q.      Is that phone number familiar to

3       you at all?

4           A.      No, I can't say it is.  I mean,

5       I --

6           Q.      What was the phone number at

7       Paradise's office?

8               MR. STANTON:  In 1998?

9               MR. SILVESTRI:  In 1998.  Thank

10      you.

11              THE WITNESS:  I don't know.  Well,

12      I can't remember.  I don't know.  They're

13      out of business.  I don't know.  Paradise, I

14      think theirs was 08 something, 088 or

15      something.

16          BY MR. SILVESTRI:

17          Q.      Would it be fair to say that you

18      don't have any personal knowledge, as you sit

19      here today, of whether or not John Cheng knew

20      that Margaret Lee forged the Power-of-Attorney

21      that's been marked as Exhibit B?

22          A.      No.

23          Q.      It is fair to say that; that

24      you --

25          A.      I'm sorry.  Say -- this is really

Page 52

1          bothering me, this thing here.

2               Q.    Let me --

3                     MR. STANTON:   Referring to -- I'm

4          sorry. Go ahead.

5                     THE WITNESS:   This -- I want this

6          piece of paper.

7               BY MR. SILVESTRI:

8               Q.    All right.  Let me ask you a

9          question and then I understand that that's --

10         you're concerned about that.

11              A.    What?

12              Q.    Is it -- so let me ask you a

13         question while you're focusing on it.  Is it

14         fair to say that you don't have any personal

15         knowledge as to whether or not John Cheng

16         knew that Margaret Lee forged the

17         Power-of-Attorney that's been marked as Exhibit

18         B?

19              A.    No, I have no idea.

20              Q.    So my statement, you would agree

21         it's a correct statement; you have no

22         personal knowledge?

23              A.    I have no personal knowledge.

24              Q.    Okay.  Can you give us your date

25         of birth?

1          A.      June 19th, 1952.

2          Q.      And how did you learn --

3          withdrawn.

4                  How did you get the information

5          that you told us about the homeowner in this

6          transaction dying -- that she was dying of

7          cancer?

8          A.      From the client.

9          Q.      And the client was who?

10         A.      I don't know who I spoke to.  I

11         don't know if it was Nancy Chang or Margaret

12         Lee.  It was an Asian woman.  Whoever the

13         woman was that contacted me that I -- or I

14         was told to contact, however I got the file,

15         explained the whole situation to me.

16                 MR. SILVESTRI:  Mark that, please.

17         This is Plaintiff's 2.

18                 (Certification of Ronald Reba dated

19         7/14/06 was received and marked as Exhibit-P-2

20         for identification.)

21            BY MR. SILVESTRI:

22         Q.      This is a certification of Ronald

23         Reba dated July 14th, 2006 that was filed in

24         this case.  I take it you haven't seen this

25         before, have you?

Page 54

1           A.    No.

2           Q.    I'm going to refer you specifically

3     to Paragraphs 2 and 3.

4           A.    Okay.

5           Q.    I'll just ask you to read them and

6     then after you've read them, my question is

7     whether there's anything you disagree with in

8     those paragraphs?

9           A.    No.  It's correct.

10          Q.    And is it also fair to say that

11    at the time you were dealing with this loan

12    transaction, you had no idea whether or not

13    Margaret Lee was also dealing with John

14    Cheng?

15          A.    I have no idea, no.

16                MR. SILVESTRI:  All right.  I

17    don't have anything else.  Thank you.

18          FURTHER EXAMINATION

19          BY-MR.STANTON:

20          Q.    Just for the sake of good order,

21    you and I have never met so would you mind

22    giving or showing us your driver's license so

23    we can --

24          A.    I can bring it up to you.  I

25    have it in the car.

Page 55

1          MR. STANTON:  I mean, let's go off

2      the record.

3          (Discussion off the record.)

4      FURTHER EXAMINATION

5      BY-MR.SILVESTRI:

6      Q.    Mr. Govern, when we were off the

7      record, you were commenting on the signature

8      that apparently somebody signed that purports

9      to be your name on the mortgage deed,

10     Plaintiff's Exhibit 1.

11          And I did not ask you before so

12     let me ask you now whether that signature, as

13     you look at it, has any resemblance to your

14     signature?

15     A.    Yeah, some.

16          MR. SILVESTRI:  Okay.  Okay.

17     Thank you.

18     FURTHER EXAMINATION

19     BY-MR.STANTON:

20     Q.    And I want to -- let me go back

21     on the record just for a moment, and so

22     we're clear as we're discussing it, but did

23     you sign as a witness for that open-end

24     mortgage?

25     A.    No.

Page 56

1          Q.     And so that's not your signature,

2     is it?

3          A.     No.

4          Q.     And did you attend a closing in

5     Connecticut in October of 1998?

6          A.     No.

7                 MR. STANTON:  All right.  We're

8     off the record.

9                 (Discussion off the record.)

10        FURTHER EXAMINATION

11        BY-MR.SILVESTRI:

12        Q.     Mr. Govern, under the Rules of

13    Court, if you want to, you can read this

14    transcript and make any corrections that you

15    feel are necessary, either as to form or

16    substance, you know, correct a typo, or if

17    you made a mistake, write that in, or you

18    can waive that right, and it's totally up to

19    you.

20                If you do want to read and sign

21    it, arrangements will be made for you to get

22    a copy of the transcript, and then you'll

23    have 30 days to sign it in front of a

24    notary, make the corrections and send it

25    back, and if you don't get it back within 30

Page 57

1       days, then you're also deemed to have waived

2       it.

3              A.      Okay.  Yes.

4              Q.      So do you want to read and sign?

5              A.      Yes.

6              Q.      Okay.

7                      (Deposition concluded at 11:52

8       a.m.)

9       .

10      .

11      .

12      .

13      .

14      .

15      .

16      .

17      .

18      .

19      .

20      .

21      .

22      .

23      .

24      .

25      .

Page 58

1                         DESCRIPTION OF DEFENDANT'S EXHIBITS

2          EXHIBIT DESCRIPTION

3          A        Notice of Deposition

4          B        Power of Attorney

5          C        FBI Transcription dated 5/7/99

6          P-1      Open-End Mortgage Deed

7          P-2      Certification of Ronald Reba dated

8                   7/14/06

9          .

10         (Exhibits retained.)

11         .

12         .

13         .

14         .

15         .

16         .

17         .

18         .

19         .

20         .

21         .

22         .

23         .

24         .

25         .