

FD-302 (Rev. 10-6-95)



- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   5/7/99

    MARGARET LEE consented to a proffer session in the presence of her attorney, DOMENIC R. IAMELE, Assistant United States Attorneys GREGORY WELSH and MICHAEL CUNNINGHAM; Financial Analyst (FA) THOMAS E. SIMMONS and Special Agent (SA) MAURA J. LATING from the Federal Bureau of Investigation (FBI). LEE's proffer session took place over two meetings on April 26, 1999 and May 3, 1999 at the United States Attorney's Office. LEE made the following statements:

    LEE admits that her sister, NANCY CHANG, did not give LEE power of attorney to handle the obtaining of a loan using CHANG's 36 Upland Drive, Greenwich, Connecticut, property as collateral. LEE knew the property had no liens and was worth at least a million. LEE admitted to forging CHANG's name to a power of attorney document to obtain a loan. LEE admits that CHANG never received any of the proceeds of the approved loan in question. LEE denies that her daughter ANNA WANG had any role in this loan being approved but she did receive two thousand dollars of the funds. WANG was not aware of this fraudulent loan until LEE was arrested. LEE implicates JOHN CHENG from SINOWEST FINANCIAL SERVICES, New York, and CHARLES GARVIN (phonetic) as being aware that the loan was fraudulent because CHANG was not aware of the loan. LEE advised that there is no money left from the $848,000.00 received from the approved loan. LEE explained the chain of events related to this fraudulent $975,000.00 loan that was funded by EASTERN SAVINGS BANK.

    LEE recalled the winter of 1997, CHANG talked about money problems. LEE talked with CHANG about getting a loan to have money and pay off some debts. CHANG lived in a home worth a million or more without liens. LEE read an advertisement in a New York Chinese newspaper for SINOWEST (full company name not recalled) located on Elizabeth Street, New York, which is actually in Chinatown. LEE calls the advertised telephone number for SINOWEST to make an appointment to visit their office. LEE talked to JOHN CHENG about a loan. She recalled his response was something to the effect, "How you found me?" She told him through the Chinese newspaper (newspaper name does not translate well into English). She told him about CHANG having a lien free property in Greenwich worth about two million. LEE continued to tell CHENG that CHANG was interested in his advertised no income

Investigation on  4/26 & 5/3/99 at  Baltimore, Maryland      B0062

File # 29B-BA-96293      Date dictated  5/4/99
    FA THOMAS E. SIMMONS
by  SA MAURA J. LATING:spp

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On _4/26 & 5/3/99_ , Page _2_

loan so CHANG could pay off debts. CHENG was interested and set up a meeting for CHANG and LEE to meet CHENG to discuss a loan. CHENG was confident that CHENG could help CHANG. LEE told him that CHANG did have a tax lien on the property and had over extended the credit limit on her credit card accounts. CHENG wanted to know if there was anyone else's name on the property. LEE told CHENG no one else's name was on property.

LEE first went alone to meet with CHENG at the SINOWEST office because she wanted to see him first before CHANG got involved. LEE recalled that there was a doorman outside CHENG's office. She recalled CHENG had a small office with only a few desks. She met with CHENG. CHENG asked LEE to show some form of identification. The doorman had earlier asked LEE before he let her into the office, "What do you want him for?" (referring to CHENG). She overheard men talking in Cantonese language behind a closed door in CHENG's office. She could only hear that they were discussing someone coming in to make a payment in cash. LEE was scared based on the loud tone of their voices.

CHENG discussed with LEE that CHENG charges a high fee for the loan processing. CHENG would not tell LEE how high the fees would be for handling the loan. She did ask CHENG how much she could borrow. CHENG projected about a million and a half dollars could be borrowed. LEE told CHENG that her sister did not need that much money. The first meeting ended with CHENG telling LEE, "Better not go to another person. I'm the best."

CHENG insisted on meeting with CHANG. LEE canceled two future scheduled meetings with CHENG because she was nervous dealing with him. She was not sure she wanted to have CHANG meet CHENG. LEE was aware that JOHN CHENG's family controlled the west side of Chinatown as in organized crime. She did shop around to other mortgage companies in the Flushing, New York, areas to see if she could obtain a loan. She did not seem to have a problem getting several mortgage companies interested in granting a loan with CHANG's two million dollar property as collateral.

LEE finally went back to CHENG's office on the third scheduled meeting. She did not show up for the two other meetings. CHENG wanted to meet with NANCY CHANG. She went alone to see CHENG for this second meeting. CHANG was at the time just down the street shopping in Chinatown. CHENG insisted on seeing

B 0063

D-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On __4/26 & 5/3/99__ Page __3__

CHANG. LEE and CHENG went to get CHANG from shopping. They went back to CHENG's office. CHENG had CHANG sign blank forms that had real small print so she does not know what CHANG was signing. LEE did not have her eyeglasses. LEE was nervous during this meeting. CHENG was not explaining what was being asked to be signed by CHENG. CHENG was provided CHANG's Social Security Account Number and her home telephone number (area code 203, telephone number not recalled). LEE recalled that the meeting lasted until 5:00 or 6:00 p.m.

CHENG called CHANG the next day to let her know that there was no home owner's insurance on her property. CHENG said she had pulled CHANG's credit report and found this out. CHENG kept calling CHANG's telephone number but CHANG was not returning his calls. CHANG was not interested in obtaining a loan with CHENG. CHANG did agree to a home appraisal on her house. CHENG was so "jumpy" when she was not sure if she still wanted to get a loan. He told LEE that he had a lot of people working for him. A female appraiser came in around December, 1997 to appraise the interior and exterior of CHANG's home. CHENG arranged this appraisal. LEE was there when the appraiser came to the house. CHANG was not living at the Greenwich home at the time. CHANG was renting the home and living in a rented room elsewhere. LEE heard later from CHENG that he was excited about the results from the appraisal.

CHANG was repeatedly receiving telephone calls from CHENG after the appraisal was complete. CHANG was no longer interested in obtaining a loan from CHENG or anyone. CHANG did not return any of CHENG's calls. CHANG never directly spoke with CHENG to say "no" or "yes" to a loan. LEE had returned to her 301 Blue Bayou Drive, Kissimmee, Florida, residence. LEE cannot recall her home phone number at the time. CHENG contacted LEE down in Florida about the status of the loan and that CHANG was returning calls. LEE told CHENG that CHANG was not interested in a loan anymore. CHENG was angry with LEE not CHENG because in LEE's opinion, CHENG looked at CHANG as too old. CHENG told LEE to call if she needed him. She recalled that he offered a "better deal" over the phone. At this point, LEE was interested. She told CHENG that she was starting a fashion and jewelry business and needed money for investment in the business. CHENG told her that he could help her. She added that she was getting calls from unidentified males telling her over the telephone that

B 0064

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__, On __4/26 & 5/3/99__, Page __4__

if she does not take the loan, then something bad will happen to LEE. She realized that she was "getting into serious organized crime." She feels now that CHARLES GARVIN is more dangerous than CHENG.

    Around February, 1998, LEE returned to New York and started shopping around for a mortgage company that will offer a better deal on a loan than CHENG. She impersonated NANCY CHANG when she visited those mortgage companies. She recalled one company visited was TRANSGLOBAL MORTGAGE. LEE spoke with a JENNIE at TRANSGLOBAL who referred LEE to another person not associated with a bank or mortgage company. LEE pretended that she was NANCY CHANG to see if they were interested in giving her a loan. LEE noted that this male (name unrecalled) did not seem interested in approving a loan. She met with this male in New York. LEE recalled when she left and was walking to her car that the male came out and told her that he knew she was not NANCY CHANG. LEE could only describe the male as a white male and overweight. LEE was asked if DICK SORENSON seemed familiar to her. LEE believes that was his name. LEE never heard anything from TRANSGLOBAL. LEE contacted other mortgage companies in the New Jersey and New York areas but she cannot remember the names of the companies.

    LEE realized she was getting a better deal with CHENG. She returned to see CHENG. CHENG told LEE that the appraisal of CHANG's property was "strong." LEE told CHENG that CHANG does not want a loan. CHENG suggested a power of attorney document be drafted to give LEE authority to get a loan using CHANG's property as collateral. LEE asked CHENG, "Don't I have to get Nancy's permission?" She had told LEE that CHANG had given LEE a power of attorney document that was written in Chinese when CHANG was interested in selling her house sometime in 1996-1997. CHENG told LEE that she needed the power of attorney document drafted in English.

    CHENG told LEE that she did not have to prepare the power of attorney. LEE was told to find an attorney in New York or Connecticut to draft the power of attorney document. LEE did not want to have to do this. CHENG told her that he had "another guy who does it." CHENG told her that when the power of attorney document is ready that he will contact her. LEE did not respond to this power of attorney idea and left CHENG's office. CHENG

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On __4/26 & 5/3/99__ , Page __5__

told her something to the effect, "We help you a lot. Maybe you do not want to do it. Maybe something happen to you and family." LEE returned to Florida.

    LEE received a package from an attorney (name unrecalled) in New Jersey. The package contained a power of attorney document with CHANG and LEE's name on it. The document stated that LEE had the authority to obtain a loan using CHANG's Greenwich, Connecticut, property as collateral. LEE was shown the document by Assistant United States Attorney (AUSA) CUNNINGHAM. LEE confirmed that this is the document. LEE noted that RONALD REBA, as mentioned on the document, is the attorney that sent the document to LEE. The package had a return envelope with REBA's return address. LEE advised that GARVIN had called LEE and told her not to mail back the signed power of attorney document because a different version of the same document would be mailed and get notarized. LEE does not recall what changes were made. GARVIN told LEE that the first version was not good enough. CHENG and also GARVIN told her to get the document notarized in Florida. CHENG and also GARVIN, in separate phone conversations, told LEE to mail back the signed power of attorney document to the attorney on the self-addressed envelope. The document was completed except for the signatures of CHANG and LEE. She does not know if GARVIN knew CHANG was not aware of the power of attorney. The attorney was RONALD REBA from New Jersey. LEE never talked with or met REBA. LEE may have the envelopes that REBA sent the two versions of the power of attorney document. These envelopes may have been in her storage.

    CHENG knew that LEE did not have CHANG's permission to have this power of attorney and that CHANG was signing the document. CHANG knew nothing about the existence of the document. LEE advised that she did try to reach CHANG during this time but CHANG was not speaking to LEE because LEE owed money to CHANG for a cruise that she did not go on and paid by CHANG.

    CHENG kept calling LEE from March to April, 1998 at LEE's Blue Bayou residence. She also talks on the phone with a CHARLES GARVIN (phonetic) from PARADISE MORTGAGE. GARVIN was working with CHENG to get a loan in the name of NANCY CHANG. She recalls one telephone conversation with CHENG that he could get a loan for her assuming she was NANCY CHANG. LEE responded to CHENG, "I'm Margaret." CHENG stated, "You have to be Nancy." She

B 0066

)-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On __4/26 & 5/3/99__ , Page __6__

had a phone conversation with GARVIN about his charge of 2% fee. LEE advised that she had taped telephone conversations with GARVIN and CHENG that should be pertinent to the investigation. She also has records that she has in a box as well as the tapes in storage in Florida. LEE is trying to get someone to forward these records and tapes to her attorney. She noted that she taped the conversations after GARVIN told her that she did not need to meet him.

LEE also got a call at her Florida residence from a male who represented himself as a certified public accountant (CPA) and discussed the possible loan in NANCY CHANG's name. She assumes that CHENG referred this male to her.

LEE's daughter, ANNA WANG, drove her to a MAILBOX ETC business in the Kissimmee, Florida, area to get the power of attorney document notarized. ANNA did not come in with LEE. LEE alone was able to get the document notarized by a Hispanic male (name unrecalled). The Hispanic male notarized two copies of the document. LEE had the Hispanic male initial next to LEE's name to show that he had checked her identification. She left blank the signature line for NANCY CHANG when she got the document notarized. The notary never questioned the CHANG signature line or why CHANG was not present. The notary did not copy LEE's driver's license. LEE denies that her daughter knew about what LEE was doing at the MAILBOX ETC.

LEE was advised by SA LATING that the notary public referred by LEE is name JOSE PAGAN. PAGAN advised during an FBI interview that he would not have notarized the documents without two persons being present. PAGAN stated he recalled that LEE came in with another Oriental female because LEE was a frequent customer to his business to get stamps. PAGAN was aware that LEE lived nearby. LEE restated that she was the only one present before the notary public.

CHENG told LEE to sign NANCY CHANG's signature before sending the notarized documents back to the attorney, REBA. LEE told CHENG that NANCY CHANG was not in Florida with her. CHENG told LEE that they cannot wait. LEE admits to forging NANCY CHANG's signature to the power of attorney documents. LEE asked about the call from the certified public accountant (CPA). CHENG told her that she needed a CPA to approve the loan.

B 0067

D-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On __4/26 & 5/3/99__ Page __7__

    LEE noted she mailed one of the notarized power of attorney documents to REBA but she hand delivered the other original to CHENG in July, 1998. CHENG insisted on keeping the original instead of making a copy for his records.

    CHENG, GARVIN, CHENG's girlfriend (name unrecalled) went with LEE to the closing of the loan that was ultimately handled by a mortgage broker business named TCRM ADVISORS located in Connecticut. She had met once with SOLINSKY before this meeting. CHENG had given SOLINSKY her telephone number. CHENG told LEE what to say to SOLINSKY. They all met at the bank's closing attorney's office named M. DEAN MONTGOMERY located in Connecticut. The TCRM BROKERS' name was (First Name Unknown) SOLINSKY (phonetic). SOLINSKY was also present. The loan amount was $975,000.00 but LEE ultimately received $848,000.00. CHENG insisted to MONTGOMERY that eleven checks be made for the loan distribution. CHENG first requested cash but MONTGOMERY said "no" to cash. LEE advised that MONTGOMERY and CHENG did leave the room together after the discussion about how many checks. The check were to be all payable to NANCY CHANG. LEE denies telling MONTGOMERY or anyone else, including other mortgage companies, that CHANG was dying of cancer. MONTGOMERY told them that it would take a few days to get the checks.

    LEE was asked about the phone call made by MONTGOMERY to supposedly NANCY CHANG to confirm she knew about the loan. LEE advised that CHENG gave her several phone numbers with New York, Connecticut, and Florida telephone numbers. She gave MONTGOMERY a 407 area code number. LEE does not know who answered the phone when MONTGOMERY called. LEE had told CHENG what number she gave MONTGOMERY. LEE denied ANNA WANG impersonated NANCY CHANG during this call. LEE explained that ANNA may have said during an FBI interview that she handled this call because she was scared during this interview. LEE heard from her daughter that the FBI agent was yelling at WANG. LEE thinks WANG finally gave in and said "yes" but LEE said she did really impersonate CHANG.

    CHENG told MARGARET that she would have to stay with CHENG's girlfriend until the checks were ready to be picked up. LEE said "no." GARVIN checked LEE into a SHERATON HOTEL in "Showboat" Connecticut. GARVIN also checked in the same hotel. GARVIN paid with a credit card.

B 0068

D-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of  MARGARET LEE  , On 4/26 & 5/3/99 , Page 8

    CHENG and his girlfriend joined LEE to go to BANK OF EAST ASIA, New York. CHENG chose BANK OF EAST ASIA to have LEE open an account to deposit the checks from MONTGOMERY a few days later. CHENG told her to use his girlfriend's New Jersey address (address unrecalled). LEE opened three bank accounts at BANK OF EAST ASIA. One account was opened in the name of CHANG and LEE. The second account was a savings account in LEE's name. The third account was LEE's business name, NEW STAR FASHION TRADING.

    LEE and CHENG picked up the checks from MONTGOMERY a few days after the closing of the loan. Just a couple of the checks were deposited the same day or day after at BANK OF EAST ASIA. CHENG still would not tell LEE the amount of CHENG's fee. CHENG told LEE that withdrawals would be in cash. CHENG did not want her to deposit all the checks on the same day. CHENG had LEE open a safe deposit box at BANK OF EAST ASIA to hold the remaining checks until CHENG told her to make another deposit. CHENG held the key to that safe deposit box. CHENG and/or his girlfriend joined LEE for the deposits and withdrawals.

    LEE recalled one large withdrawal of cash that they all went back to CHENG's office and split the money.

    LEE advised that bank records will reflect that there is an official bank check payable to JOHN CHENG's business, SINOWEST FINANCIAL, for $50,000.00. CHENG wanted cash but LEE insisted on the bank check because CHENG wasn't going to give LEE a receipt for payment of his fee. LEE gave him another $135,000.00 after a large withdrawal from her account. She also withdrew $120,000.00 one day and was on her way to see JOHN CHENG. She was robbed by a Chinese male going down a street in Chinatown. LEE was able to grab $27,000.00 before the robber ran away. LEE thinks CHENG sent this Chinese male to rob her because he knew she was going to the bank. LEE added, "I can't prove it."

    LEE was contacted by a female from EASTERN SAVINGS BANK, Baltimore, Maryland, about automatic withdrawal payment arrangements of $12,400.00 a month for the loan. LEE first found out about EASTERN SAVINGS BANK being the bank when she was contacted by the female. LEE mailed via FEDERAL EXPRESS a BANK OF EAST ASIA starter check from her business account to the female employee at EASTERN SAVINGS BANK. LEE thought the name of SUSAN SCHROCK sounded familiar once provided by SA LATING. LEE

B 0069

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__, On __4/26 & 5/3/99__, Page __9__

kept sufficient funds to cover the automatic withdrawals until May 1, 1999. She was going to deposit additional funds from profits made on her jewelry business. She had made contracts with PEARL SUPPLIERS and expected payments from them by May, 1999.

LEE advised that she changed safe deposit boxes at BANK OF EAST ASIA because she did not like that JOHN CHENG had a key to the box. She told the bank she lost her key and they changed her box number. CHENG was not too happy.

LEE admitted that CHANG never received any funds from the loan. CHANG had no idea her property was used as collateral. LEE recalled that CHENG said that a year later, the bank would auction the house. LEE told him that would not happen.

CHANG was aware that LEE was trying to get a loan in CHANG's name from the beginning of 1997 until the summer of 1998 when CHANG did not want a loan or sell the house. From the summer of 1998 to the present, CHANG had no idea what was going on. LEE claims that CHANG gave her the CHANG's driver's license and Social Security card to be copied.

LEE explained how she spent the loan proceeds. She deposited $190,000.00 into BANK OF EAST ASIA, Hong Kong, and obtained a check and bought a jade stone. She invested $417,000.00 in a pearl contract with a China business for $200,000. She spent 40 carats of ruby and sapphires, 10-15 pieces worth $200,000. She had a BANK OF TAWAIN account with $29,500.00 balance. She has since used this $29,500 to pay back her ex-husband, HSU LEE. She gave $2,000.00 to ANNA WANG for being there for her when she was sick. She also bought wine and gifts for her business customers. The safe deposit box is empty at BANK OF EAST ASIA. LEE denied gambling any of the stolen funds. LEE was advised that her credit report reflects gambling debts in Reno, Nevada, being charged off by casinos. She said that was years ago when she was entertaining Chinese customers and they wanted to gamble so she advanced money to them to gamble and was not paid back.

ANNA WANG bought a house in Las Vegas, Nevada with money she saved working at RED LOBSTER. She is not working anywhere now. LEE claims there is a mortgage on the house. LEE

B0070

FD-302a (Rev. 10-6-95)

29B-BA-96293

Continuation of FD-302 of __MARGARET LEE__ , On __4/26 & 5/3/99__ , Page __10__

denies giving money to WANG to buy the house.

  LEE's address book has "Katy (John-Sinowest) #732-287-4344." LEE thinks this is CHENG's girlfriend. There is also a reference to "Charles" under the SINOWEST FAMILY COMPANY, 212-965-1100, which states "Charles 908-610-6694." LEE advised this is CHARLES GARVIN's telephone number. She describes CHENG's girlfriend as a white female, age 20-30's, short hair, and short in height.

  LEE never saw CHARLES GARVIN or CHENG carrying weapons. She noted that they would both stand with their hands in their pockets. GARVIN once talked to LEE about a person that he had that handles the collection of money. LEE mentioned that CHENG wanted LEE to invest in CHENG's business and get a 25% return on her investment. LEE said "no."

  CHENG's family control the west side of Chinatown in New York. LEE could not provide any other details about CHENG or possible criminal activity by SINOWEST or the CHENG family.

B 0071